Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio





# MEMORANDUM OPINION

No. 04-09-00571-CR

Roger **ARIAS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CR-5113A
Honorable Mary D. Roman, Judge Presiding

Opinion by:   Phylis J. Speedlin, Justice

Sitting:       Karen Angelini, Justice
              Phylis J. Speedlin, Justice
              Rebecca Simmons, Justice

Delivered and Filed:  December 29, 2010

AFFIRMED

Roger Arias was convicted by a jury of murder.  On appeal, Arias contends the trial court erred in overruling his objections to testimony and photographs revealing his gang membership and to evidence of an extraneous offense.  Arias also contends the trial court erred in overruling his objection to the prosecutor's closing argument.  Finally, Arias challenges the sufficiency of the evidence to support his conviction.  We affirm the trial court's judgment.

## BACKGROUND

On January 4, 2008, Elizabeth Melgosa was in her apartment at the Ingram Ranch Apartments, which had windows facing the parking lot. Around 7:00 p.m., she heard men arguing outside for a few minutes before she heard a pop like a firework. Melgosa looked out the window and saw a person lying facedown on the sidewalk who looked dead. A white car and a gray/silverish car were parked in parking spaces close to the person on the sidewalk, and a blue or dark-colored Cadillac was parked behind those cars. Melgosa observed a man getting into the gray/silverish car. As the man was getting into the car, Melgosa heard him say, "[t]hat's what you get." All three cars were then driven away. On cross-examination, Melgosa agreed that she told the police in her statement that it was hard to see that night.

Officer Robert Aguirre testified that he had previously responded to many calls from the Ingram Ranch Apartments for various disturbances involving narcotics, stolen cars, and shootings. When Officer Aguirre arrived at the apartment complex, he observed a male lying facedown with a lot of blood coming from his upper torso. Officer Aguirre stated that the lighting when he arrived was adequate, and he did not have any problems observing the scene. No cars were around the person when Officer Aguirre arrived. Officer Aguirre briefly spoke with Melgosa regarding her observations and was able to ascertain that a dark colored, possibly brown Cadillac and a white sedan, both occupied by Hispanic males, had left the scene.

Officer Ronald Garcia was the first officer to arrive at the scene. When Officer Garcia arrived, no cars were in the area around the victim. Officer Garcia stated that residents of the apartment complex were not lined up to talk with the officers about their observations because the apartment complex was a "rat hole" that attracted "drugs and family violence." A family

member of the victim arrived at the apartment complex and identified him as Andre Garcia. Andre's vehicle, a 2000 silver four-door Mercedes, was reported as stolen.

Andre's brother, Mario Morales, saw his brother the night of the murder at their mother's house. Mario testified that Andre would occasionally sell cocaine. Andre asked Mario to go with him to sell drugs to a few guys, but Mario refused, saying he would meet him later to play pool. Andre left in his Mercedes. When Andre did not answer his cell phone, Mario called another friend, Abel, who told him where Andre had gone to sell the drugs. When Mario arrived at the apartment complex, he identified Andre as the victim. Andre's car was not at the scene.

Abel Martinez had been friends with Andre for approximately ten years and sold drugs with him. In the courtroom, Abel identified Arias as Taz and stated he did not know Taz by his given name. Abel met Taz six months before Andre's death and had done business with him about three or four times, including one time at the exact location at the apartment complex where Andre was murdered. Abel had seen Taz driving a green Cougar and a white Stratus. Four days before the murder, Taz contacted Abel about purchasing 4-1/2 ounces of cocaine. Abel called Andre who said he had the cocaine to sell. Both Taz and Andre called Abel during the next four days about arranging the sale and purchase of the drugs. Abel finally arranged for Taz and Andre to meet and finalize the deal at the location where Andre was shot. When Taz and Andre called Abel because they could not find each other, Abel determined Andre was at the wrong apartment complex and directed Andre to the apartment complex where Taz was waiting and where Andre was subsequently shot. When Abel tried to call Andre some time later, Andre's phone was off. Abel subsequently learned Andre was dead. Abel then anonymously contacted a detective and told him Taz had murdered Andre. After checking phone records and

identifying Abel as the anonymous caller, a different detective contacted Abel who gave a statement to the police.

On cross-examination, Abel admitted that he did not mention the drug deal between Andre and Taz in the statement he gave the police, but instead told the officer he did not think Andre's murder involved drugs. Abel testified that he did not want to get in trouble for dealing drugs. Abel also admitted that he told the officer taking his statement that he was not 100% certain Taz was the person he picked in a photo lineup; instead, he was only 90% sure. Abel further admitted that he said he had seen Taz only one time in his statement. Abel agreed that he was not present when Andre was shot and could not be certain Andre and Taz actually met the day of the murder. Abel admitted that he was a prison inmate at the time of trial and was eligible for parole a few months after the trial. Abel testified that he had not been promised anything in exchange for his testimony and did not testify to be looked upon favorably by the parole review board.

Sergeant David Pruitt was the night detective initially assigned to investigate Andre's murder. He arrived at the scene thirty to forty-five minutes after the officers initially arrived. Sgt. Pruitt canvassed the neighborhood, knocking on doors to determine if anyone witnessed the shooting. Sgt. Pruitt interviewed Melgosa and observed that she had an unobstructed view of the parking area where the murder occurred from her window. After he returned to his office, Sgt. Pruitt received an anonymous phone call. The caller told him that a guy nicknamed Taz who drove a white Dodge Stratus committed the murder. The caller also told him Taz was Hispanic and had tattoos. Sgt. Pruitt included this information in his report which was forwarded to the follow-up detectives.

Officer Jorge Hernandez testified that he was informed during roll call that a car had been stolen earlier in the evening and was given a description of the vehicle and license plate. Officer Hernandez subsequently located Andre's vehicle abandoned on a street.

Randall Hines was assigned as the primary homicide investigator for Andre's case. Hines testified that he canvassed the neighborhood at the apartment complex, but no one had any information. He further testified that the fingerprints taken from Andre's vehicle were not legible. Hines contacted the gang unit because he had been given a suspect nickname or tag name of Taz. After conducting computer research, Hines discovered Taz was Arias's nickname in the Wrecking Crew gang. Hines further discovered that James Govea also was a member of that gang and a known associate of Taz. Hines subsequently interviewed Govea. Based on information Govea provided, Hines located the Cadillac that Melgosa described from the scene of the murder. The Cadillac was subsequently stopped, and the records showed that Arias was the owner. A crime stoppers tip led Hines to a white Dodge Stratus which also was owned by Arias. Hines also obtained a recording from Jacob Keller in which Arias and Govea made statements relating to Andre's murder.

On cross-examination, Hines admitted receiving tips that pointed to individuals other than Arias after a crime stoppers reward of $5,000 was offered. One individual stated that Andre was killed over a $2,000 debt. Another tip was that Andre was killed because he was a drug dealer but was not paying "taxes" to a local Mafia. Another tip was that Andre was killed by Oscar Hernandez as part of his gang initiation. Another person stated that a person named Nick was involved in the murder. Another tip was that Andre was killed over a quarter kilo of cocaine. Hines testified that the only tips that panned out were the ones pertaining to Taz.

Donald Redman, Jr. was driving the Cadillac when it was stopped. Christopher "Ace" Ruiz is Redman's son-in-law. Ace and Taz are cousins. Redman also knew Govea, but he only knew him by his nickname which was Shorty. Redman testified that Taz drove a white car, and Ace drove a dark gray Cadillac. The Cadillac was in Arias's name because Ace did not have a driver's license. Redman testified that on January 3, 2008, Shorty and Taz came to the apartment where Redman, his wife, his daughter, and Ace lived. They retrieved a Tupperware bucket containing a shotgun. The following evening Taz came back to the apartment and retrieved two boxes of ammunition.

Celso Montanez knew Andre, Taz, Govea, and Ace. Taz, Govea, and Ace were members of the Wrecking Crew gang. Andre had never met Taz. Montanez heard gossip that Govea and Taz were responsible for Andre's murder. Montanez purchased a recording device and planned to meet with Govea and Taz to record a conversation in which Montanez believed they would confess to killing Andre. Jacob Keller agreed to help Montanez. Montanez drove to the neighborhood where Govea lived; however, when he arrived, he saw Taz, Govea, and Ace all being arrested. Montanez discovered they were arrested on drug charges and decided to bond Govea out of jail. After bonding Govea out of jail, Montanez went to Govea's house and asked if Govea wanted to get back on Montanez's "team" to sell drugs. Montanez and Keller were taking Govea to a bar when Taz called, and they picked Taz up from a bus stop. The four men started drinking beer, and Montanez gave Govea money to buy heroin. As they were returning to Taz's apartment from a bar, Govea told Montanez that they had been "merking" or murdering people. Govea and Taz told Montanez how they robbed and killed Andre, took his Mercedes, "cleaned it down," and dropped it off. The audio recording of portions of the conversation was played for the jury. When Keller offered to pay $1,000 to whoever actually shot Andre, Govea

responded that they did it as a team. Montanez understood that Ace was the third member of the team.

A video of two phone calls Arias made from the interview room after he was arrested for Andre's murder were introduced into evidence. During one phone call, Arias refers to the meeting with Montanez and Keller after Govea had been bonded out of jail. Arias states that he did not tell them anything. Arias also reassures the person he was calling that he knew the person was not the "snitch" because details of the murder on the internet were incorrect.

Three photographs of Arias were introduced into evidence. One photograph showed a tattoo of a Tasmanian Devil on Arias's stomach. Another photograph showed the word Taz tattooed on Arias's hand.

Dr. Masahiko Kobayashi testified that Andre was killed by a shotgun wound to the chest. The medical examiner's office ruled the death a homicide.

SUFFICIENCY OF THE EVIDENCE

In his sixth point of error, Arias challenges the legal sufficiency of the evidence to support his conviction. In determining the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As a reviewing court, we "defer to the jury's credibility and weight determinations because the jury is the **sole** judge of the witnesses' credibility and the weight to be given their testimony." *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at \*5 (Tex. Crim. App. Oct. 6, 2010). Although Arias also asserts a factual sufficiency challenge in his seventh point of error, the Texas Court of Criminal Appeals recently held, "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in

determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 2010 WL 3894613, at \*1.

Viewing the evidence as the jury could, the evidence established that Arias arranged to meet Andre at the time of the murder to purchase drugs, and Andre was murdered at the location where Abel arranged for Arias and Andre to meet. An eyewitness gave a description of three cars in the area at the time of the murder. Arias owned two of the cars, and the third belonged to Andre. Arias and Govea were seen with a shotgun the day before the murder, and Arias was killed by a shotgun wound to the chest. In an audio recording, Arias and Govea implicated themselves in Andre's murder. Finally, in his recorded phone calls, Arias refers to someone "snitching" on him and to the inaccurate details of the murder. Accordingly, the evidence is legally sufficient to support Arias's conviction.

### TESTIMONY REGARDING GANG MEMBERSHIP

In his first point of error, Arias contends the trial court erred in overruling his objection to the introduction of evidence of his gang membership at the guilt/innocence phase of trial. Specifically, Arias challenges testimony from Hines and Montanez linking him to membership in a gang.

In order to preserve error for appellate review, the record must show that an objection was made to the trial court stating the grounds for the ruling and the trial court ruled on the objection. TEX. R. APP. P. 33.1. In addition, error is only preserved if the objection at trial comports with the complaint made on appeal. *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991); *Lemon v. State*, 298 S.W.3d 705, 708 (Tex. App.—San Antonio 2009, pet. ref'd). In this case, the only objection Arias made regarding Montanez's testimony related to Montanez's testimony as the sponsor for the audio recording of the conversation between Arias, Govea,

Keller, and Montanez. This objection was made prior to Montanez's testimony outside the presence of the jury. No objection was made regarding Montanez's testimony apart from testimony relating to the audio recording, and no objection was made during trial when Montanez testified that Arias was affiliated with the Wrecking Crew gang. Accordingly, Arias did not preserve error with regard to Montanez's testimony.

Assuming Arias properly preserved error with regard to the testimony of Hines, such error would be harmless. Error in the admission of evidence is rendered harmless "if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove." *Brown v. State*, 757 S.W.2d 739, 741 (Tex. Crim. App. 1988). In this case, Montanez's testimony regarding Arias's gang membership was admitted without objection and proves the same fact of gang membership referred to by Hines. Accordingly, any error in admitting Hines's testimony regarding Arias's gang membership was rendered harmless by Montanez's testimony. *See id*. Arias's first point of error is overruled.

## PHOTOGRAPHS

In his second and third points of error, Arias contends the trial court erred in admitting photographs of him during the guilt/innocence phase of trial. Arias complains that the photographs were evidence of gang membership and should have been excluded under Rule 404(b) or Rule 403.

The photographs that were introduced into evidence were photographs showing Arias had a Tasmanian Devil tattooed across his stomach and the word Taz tattooed on his hand. Evidence that is otherwise subject to exclusion under Rule 404(b) as evidence of other crimes, wrongs, or acts may still be admissible for other purposes, such as proof of identity. *See Williams v. State*, 974 S.W.2d 324, 331 (Tex. App.—San Antonio 1998, pet. ref'd); TEX. R. EVID. 404(b). In this

case, several witnesses testified that the only name they knew Arias by was Taz. Accordingly, the photographs were admissible for purposes of identifying Arias as Taz, and Arias's second point of error is overruled. *See Merrit v. State*, No. 05-96-01619, 1998 WL 378497, at *4 (Tex. App.—Dallas July 9, 1998, no pet.) (evidence of gang affiliation admissible under Rule 404(b) to trace nickname to true name in order to prove identity) (not designated for publication).

Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. In this case, the trial court could have determined that the photographs were highly probative in identifying Arias as the person nicknamed Taz. Although testimony was introduced that Arias used Taz as a nickname, the tattoos were physical evidence linking Arias to the nickname. Arias argues the photographs were prejudicial because he has a W and a C tattooed on his shoulders which are visible in one of the photographs. Although Arias contends the W and C are evidence that he belonged to the Wrecking Crew gang, it is questionable that the jury would have made such a link from the photographs, particularly since no testimony was elicited with regard to the W and C tattoos. Moreover, the jury already heard testimony regarding Arias's gang membership. Because the probative value of the evidence was great and the danger of any unfair prejudice did not substantially outweigh its probative value, the trial court did not err in overruling Arias's Rule 403 objection, and Arias's third point of error is overruled. *See Williams*, 974 S.W.2d at 331 (holding danger of any unfair prejudice did not substantially outweigh probative value of evidence of gang membership).

### CLOSING ARGUMENT

In his fourth point of error, Arias complains of the prosecutor improperly referring to matters outside of the record during closing argument. After reminding the jury that Redman did

not want to testify and that Redman testified that he had been approached by several people "about maybe keeping [his] mouth shut," the prosecutor remarked that Redman was scared to death. The prosecutor then commented, "I don't know how much you have been looking out in the audience, if you saw that guy yesterday with the tattoos, puro orejon I don't know if you were watching him." Defense counsel's objection to the prosecutor making reference to matters outside the record was overruled. Although the State agrees the prosecutor's comment was improper, the State contends reversal is not required.

Proper jury argument generally will fall within one of four categories: (1) summary of evidence; (2) reasonable deduction from the evidence; (3) response to argument of opposing counsel; and (4) plea for law enforcement. *Ex parte Lane*, 303 S.W.3d 702, 711 (Tex. Crim. App. 2009). Referring to matters outside the record and prejudicial to the accused is improper. *Id*. Accordingly, we also agree that the prosecutor's comment was improper.

Improper argument is non-constitutional error, and a non-constitutional error that does not affect substantial rights must be disregarded. *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008); TEX. R. APP. P. 44.2(b). To determine whether an appellant's substantial rights were affected, "we balance the severity of the misconduct (*i.e.*, the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct." *Brown*, 270 S.W.3d at 872-73. "Further, in evaluating the severity of the misconduct, we must assess whether the jury argument is extreme or manifestly improper by looking at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial." *Id*. at 273 (internal quotations and citations omitted).

Viewing the State's closing argument as a whole in the instant case, we cannot conclude that there was a willful and calculated effort to deprive Arias of a fair and impartial trial, and viewing the record as a whole, we cannot conclude that Arias was prejudiced by the remarks. Although there were no curative measures, such as an instruction to disregard, the objectionable statement was an isolated statement, and the prosecutor moved on after the objection and did not again mention it. Moreover, given the evidence as a whole, including the audio recording and the recording of Arias's phone calls in which Arias implicates himself, the certainty of the conviction was unaffected by the isolated improper conduct. Arias's fourth point of error is overruled.

## DRUG SALE

In his fifth point of error, Arias contends the trial court erred in admitting evidence that he planned a meeting with Andre to purchase drugs. Arias argues that evidence of the drug sale was an extraneous offense that should have been excluded under Rule 404(b). The State counters that evidence of the drug sale was admissible as same transaction contextual evidence. We agree.

"Same transaction contextual evidence refers to those events and circumstances that are intertwined, inseparable parts of an event that, if viewed in isolation, would make no sense at all." *Delgado v. State*, 235 S.W.3d 244, 253 (Tex. Crim. App. 2007). "When evidence is admitted on this basis, Rule 404(b) is not implicated." *Id.* In this case, evidence showed that Andre did not know Arias; therefore, the evidence of the drug deal was admissible to explain the reason the two men were planning to meet, and is an intertwined, inseparable part of Andre's murder. *See id.* Arais's fifth point of error is overruled.

**CONCLUSION**

The trial court's judgment is affirmed.

Phylis J. Speedlin, Justice

DO NOT PUBLISH