02-09-446-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00446-CR

 

 


 
 
 Fredrick Terry
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 30th
District Court OF Wichita COUNTY

----------

MEMORANDUM
OPINION[1]

----------

A
jury convicted Appellant Fredrick Terry of delivery of a controlled substance and
assessed his punishment at twenty-two years’ confinement and a $10,000 fine. 
The trial court sentenced him accordingly.  In his sole issue, Appellant
contends that the evidence is insufficient to support the jury’s rejection of
his entrapment defense.  Because we hold that the evidence is sufficient to
support the verdict, including the jury’s rejection of Appellant’s entrapment
defense, we affirm the trial court’s judgment.

After
Appellant filed his brief challenging the factual sufficiency of the evidence
supporting the jury’s rejection of his entrapment defense, the Texas Court of
Criminal Appeals held that there is no meaningful distinction between the legal
sufficiency standard and the factual sufficiency standard and that the Jackson
standard is the “only standard that a reviewing court should apply in
determining whether the evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable doubt.”[2] 
Accordingly, we review Appellant’s complaint under the Jackson standard.

A
defendant has the initial burden of producing a prima facie case of entrapment.[3]
 Once evidence is produced, the burden shifts to the State to disprove the
defense beyond a reasonable doubt.[4]  This burden of
persuasion does not require the State to produce evidence to refute the entrapment
claim, but requires only that it prove its case beyond a reasonable doubt.[5]
 Normally, as well as in this case, entrapment is a jury issue because its
resolution depends mainly on weighing and assessing the credibility of the
evidence.[6]

The jury
is the sole judge of the weight and credibility of the evidence.[7]
 The jury is free to accept or reject all or any portion of a witness’s
testimony.[8]  A jury's guilty verdict
is an implicit finding rejecting the defense.[9]

In
reviewing a jury's rejection of an entrapment defense, we examine all the
evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt and also could have found against the defendant on
the issue of entrapment beyond a reasonable doubt.[10]

Section
8.06 of the penal code provides,

(a) It is a defense to prosecution that the actor engaged
in the conduct charged because he was induced to do so by a law enforcement
agent using persuasion or other means likely to cause persons to commit the
offense.  Conduct merely affording a person an opportunity to commit an offense
does not constitute entrapment.

(b) In this section “law enforcement agent” includes
personnel of the state and local law enforcement agencies as well as of the
United States and any person acting in accordance with instructions from such agents.[11]

The
Texas Court of Criminal Appeals has held that this statute contains a mixed
objective and subjective test.[12]  It “requires an accused
who claims entrapment to produce evidence that he was actually induced to
commit the charged offense; that is to say, that he committed the offense
because he was induced to do so.”[13]  After “inducement is
shown, the issue becomes whether the persuasion was such as to cause an
ordinarily law-abiding person of average resistance nevertheless to commit the
offense.”[14]

Officer
Karl King of the Wichita Falls Police Department, an undercover narcotics
investigator for the organized crime unit, testified that Angela Gilmore
contacted him voluntarily to report that Appellant had a quantity of oxycodone
to sell.  King stated that Gilmore had told him that she had sold drugs for Appellant
in the past.  Before this contact, King had never met, spoken to, or heard of
Appellant.  King testified that he never directed anyone to talk to or to set
up Appellant, nor, to King’s knowledge, had anyone in the police department
done so.

King
testified that Gilmore volunteered to set up a buy bust with Appellant; he gave
her no instructions about how to set up the transaction.  He stated that he did
not ask her to persuade or induce Appellant to sell him the pills.  King
testified that when Gilmore approached him, she had a pending theft charge and
wanted her “time reduced.”  King told her that he would “talk to the DA about
it.”  King testified that Gilmore got “[n]othing that [he knew] of” for setting
up the transaction.  King stated that he never promised her anything, never
secured a promise from anyone at the DA’s office that her time would be reduced
or the charges dismissed, and never told Gilmore anything of the kind.  He
admitted that after the buy bust occurred, he “let the DA know what she had
done for [the police].”

Regarding
the buy bust, King explained that he had told Gilmore that he wanted to buy a
hundred pills.  She had told him that they would cost in the ballpark of $20
apiece.  King testified that on the same day that he first spoke to Gilmore, he
arrived in an undercover vehicle at a convenience store parking lot in Wichita
Falls, the place chosen by Gilmore, at 1:00 p.m., the time chosen by Gilmore.  King
wore an audio wire.  Gilmore and Appellant arrived in a blue Chevy truck.  They
got into King’s vehicle, with Appellant in the front passenger seat.

Appellant
told King that there had been a miscommunication and that he had only fifty
pills, which he would sell to King for $1,000.  Appellant told King that he
could get the remaining fifty pills the next day or the day thereafter.  After
Appellant let King see the pills, King gave the signal to officers monitoring
the transaction.  Appellant, King, and Gilmore were all handcuffed so that
Appellant would not realize that Gilmore had informed on him or that King was a
police officer.  After Appellant’s arrest, the police found 173 oxycodone
tablets in a bottle in his truck.  They found numerous empty oxycodone pill
bottles in his home, and King testified that Appellant’s wife told King that
she knew that Appellant sold oxycodone to help pay the bills.  Appellant’s wife
denied telling King that.  The trial court admitted an audio recording of the
buy bust without objection.

King
testified that he (1) believed that Appellant freely and voluntarily entered
into the transaction, (2) did nothing to induce or persuade Appellant to give
him the pills, and (3) did not ask Gilmore to induce Appellant to give him the
pills.  King further testified that he had done nothing that would cause an
ordinarily law-abiding citizen to commit a crime and that Appellant seemed
ready, willing, and able, even predisposed, to commit the crime.

Officer
Joseph Anderson and Lieutenant Sam Coltrain, other officers involved in the buy
bust, testified.  Anderson stated that he did nothing to get Gilmore to induce
or persuade Appellant to sell drugs to King; Coltrain testified that he did not
direct anyone to communicate with Appellant.

Appellant
testified that he and Gilmore were good friends and that Gilmore told him that
she would go to jail if she did not get $2,000.  Appellant testified that he
told her that he did not have it and that she told him that he could get it by
selling 100 pills at $20 apiece to someone she knew.  Appellant testified that
that was the only reason that he sold King his pills.

Gilmore
denied Appellant’s version of events; she testified that she had told Appellant,
for whom she had been selling pills on a routine basis for years, that she “had
a friend to hook him up with to start selling his pills to.”  She further
testified that he had asked her to introduce him to potential buyers after she
let him know that she was not going to sell pills for him anymore.

Gilmore
testified that during her time of working for Appellant, he would bring the
pills to her house, she would sell them, and then he would pick up his profits
from her.  She was paid in pills and money.  These meetings between Gilmore and
Appellant occurred every two or three days.  She testified that he even called
her the day after her release from a stint in state jail so that she could start
selling his pills again.

Gilmore
testified that she decided to stop selling pills for Appellant because of a
rumor that the police were watching her house—she did not want to be charged
with delivery again.  She volunteered to inform on Appellant because she wanted
to stop taking the pills and stop selling them and also because she hoped that
she would get a more favorable deal on her theft charge then pending.  (By the
time of trial, Gilmore had four additional shoplifting cases pending.)  She
testified that King had told her only that he would tell the DA about her
help.  She did not know whether he had ever done so.

Gilmore
further testified that she believed that the buy bust took place the day after
she and King first spoke and that no one induced her to set up Appellant.

Based
on all the evidence, the jury, as sole judge of the credibility of the
witnesses, could have found beyond a reasonable doubt that Appellant committed
the offense (which he did not deny) and could have also disbelieved his
testimony that he committed this offense only to keep his good friend Gilmore
out of jail.  We therefore hold that the evidence is sufficient to support the
jury’s verdict, including its rejection of Appellant’s entrapment defense.

We
overrule Appellant’s sole issue and affirm the trial court’s judgment.

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and GABRIEL, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  March 31, 2011









[1]See Tex. R. App. P. 47.4.





[2]Brooks v. State, 323
S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling Clewis v. State, 922
S.W.2d 126, 131–32 (Tex. Crim. App. 1996)); see also Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).





[3]Hernandez v. State,
161 S.W.3d 491, 497 (Tex. Crim. App. 2005).





[4]Id. at 498.





[5]See id. (stating
that in the burden-shifting context, entrapment behaves like self-defense); Saxton
v. State, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991).





[6]Hernandez, 161
S.W.3d at 498.





[7]Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075
(2009).





[8]Hernandez, 161
S.W.3d at 500.





[9]Saxton, 804 S.W.2d
at 914.





[10]Hernandez, 161
S.W.3d at 500; see Saxton, 804 S.W.2d at 914; see also Jackson,
443 U.S. at 319, 99 S. Ct. at 2789.





[11]Tex. Pen. Code Ann. §
8.06 (Vernon 2003).





[12]England v. State,
887 S.W.2d 902, 913 (Tex. Crim. App. 1994).





[13]Id. (internal quotation
marks omitted).





[14]Id. at 914.