

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

### NO. AP-75,294

---

### ALFRED DEWAYNE BROWN, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. 1035159
### IN THE 351ST JUDICIAL DISTRICT COURT
### HARRIS COUNTY

---

**MEYERS, J., delivered the opinion of the Court, in which PRICE, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. KELLER, P.J., concurred in points of error one and two and otherwise joined. WOMACK, J., concurred.**

## O P I N I O N

In October 2005, a jury convicted appellant, Alfred DeWayne Brown, of capital murder committed on April 3, 2003. TEX. PENAL CODE ANN. § 19.03(a). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1]

---

[1] Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

Direct appeal to this Court is automatic. Art. 37.071 § 2(h). After reviewing appellant's four points of error, we find them to be without merit. Accordingly, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

Appellant decided, with Dashan Glaspie and Elijah Joubert, to rob the tellers at a check-cashing business. Joubert and appellant were supposed to go inside while Glaspie would act as the lookout and getaway driver. They arrived at the business as it was about to open, but the owner stymied their scheme when he displayed a handgun. Not persuaded to abandon their plan altogether, the group decided to try again at a second check-cashing store.

Alfredia Jones arrived to open that business. Gun in hand, Joubert approached Jones and went inside with her. Joubert permitted Jones to make a telephone call to an affiliated check-cashing business to say that she was "opening Center 24." This statement was actually a code to alert authorities of the robbery. Meanwhile, Glaspie and appellant, who had been waiting in an adjacent furniture store, entered the check-cashing business. Joubert then held his gun to Jones's head and ordered her to open the safe; Glaspie checked for surveillance equipment, and appellant rummaged through Jones's purse. As the robbery was occurring, police arrived, and Officer Charles Clark began to go inside. Appellant shot Officer Clark, and Joubert shot Jones, accusing her of tipping off the police. Both victims died. As part of a plea agreement, Glaspie later testified against appellant and Joubert in separate capital murder trials.

ACCOMPLICE WITNESS CORROBORATION

In his fourth point of error, appellant argues that the testimony of Glaspie, who implicated appellant in the robbery and the killing of Officer Clark, was not sufficiently corroborated to sustain his conviction under the accomplice-witness rule. This rule creates a statutorily imposed review that is not derived from federal or state constitutional principles defining the legal- and factual-sufficiency standards. *Cathey v. State*, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999). In short, it requires that, before a conviction may rest upon the testimony of an accomplice witness, the accomplice's testimony must be corroborated by independent evidence tending to connect the accused with the crime. Art. 38.14. The corroborative evidence, however, need not be sufficient in itself to establish guilt, nor must it directly link the accused to the commission of the offense. *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). We view the evidence in the light most favorable to the jury's verdict. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state. *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986). Here, it is undisputed that Glaspie, who participated in the crime and who was subsequently convicted of aggravated robbery in accordance with a plea agreement for his participation, is an accomplice as a matter of law. *See Paredes*, 129 S.W.3d at 536 (holding that "[a]n accomplice as a matter of law is one who is susceptible to prosecution for

the offense with which the accused is charged or a lesser included offense"). Thus, for the conviction to rest upon Glaspie's testimony, "there must simply be *some* non-accomplice evidence which *tends* to connect appellant to the commission of the offense alleged in the indictment." *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (emphasis in original).

Appellant argues that any such corroboration is lacking, and that because there is inadequate other evidence linking appellant to the crime, the conviction should be overturned. He states, "The only evidence that even comes close to connecting appellant with the offense was Erika Dockery's testimony that appellant told her that he 'was there.' However, state's witness Dockery was an admitted perjurer and drug abuser . . . . The testimony of accomplice witness Glaspie was not corroborated in such a way as to sustain the appellant's conviction. The conviction cannot stand." We disagree.

Erika Dockery, who testified for the State, was appellant's girlfriend at the time of the offense and lived with him at the Plum Creek Apartments. Her testimony established that appellant demanded that she lie to the grand jury investigating the crime and provide him with an alibi. She obliged, but later admitted that she had lied. She was charged with aggravated perjury, a fact that was made known to the jury, and she admitted to drug use. Dockery also testified that on the day of the crime, appellant was acting very unusually. He telephoned her and told her to watch a news broadcast regarding the crime, and she testified that when she saw him later that same day, he appeared nervous and was moaning and

crying. Most importantly, Dockery testified that she had regularly visited appellant at the jail after his arrest, and on the last day she visited him, she pleaded with him: "I need - - I want to know the truth. Did you do this? . . . I want to know. Did you kill the lady? Did you shoot the policeman? I need to know. Did you do it?" Appellant eventually responded by putting his head down and saying, "I was there. I was there."

We have held that sufficient accomplice-witness corroboration may be furnished by the suspicious conduct of a defendant, and under most circumstances, an admission or confession will be sufficient to corroborate the accomplice-witness testimony. *Killough v. State*, 718 S.W.2d 708, 711 (Tex. Crim. App. 1986)*; Jackson v. State*, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974); *see also Longoria v. State*, 154 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding that an attempt to procure a false alibi is some evidence of guilt). Here, appellant's unusual conduct on the day of the offense, his asking Dockery to provide an alibi, and his admission that he "was there" when the robbery and killings occurred, in combination, is *some* non-accomplice evidence that *tends* to connect appellant to the commission of the offense alleged in the indictment. The fact that the testimony may have been subject to impeachment as coming from an admitted perjurer and drug user goes to the weight of the evidence and not to its admissibility. *See* TEX. R. EVID. 609, 613; *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). These issues were therefore within the province of the jury as the exclusive judge of the credibility of the witness and of the weight to be given her testimony. *See Jones*, 944 S.W.2d at 647.

Even so, the veracity of Dockery's testimony regarding appellant's admission that he "was there" is bolstered by other testimony that placed appellant at the crime scene and with Glaspie and Joubert before and after the killings. This evidence, while alone not conclusive, may also be considered when evaluating accomplice-witness corroboration. *See Killough*, 718 S.W.2d at 711.

Alisha Renee Hubbard testified that, soon before the first robbery attempt, she observed appellant with Glaspie and Joubert at the Villa Americana apartments, where Glaspie and Joubert lived. She overheard Joubert ask Glaspie, "Are you ready to go do this?" and soon thereafter, she saw Glaspie loading a pistol's magazine with bullets. Another witness, Sheikah Mohammad Afzal, testified that he was an employee at the furniture store adjacent to the check-cashing business where Glaspie testified he and appellant were waiting as Joubert began the robbery. At trial, Afzal stated he was 85 percent certain that appellant was one of the two men he saw, interacted with, and watched leave the store in the direction of the check-cashing business immediately before the murders occurred. He testified, "Yes, I identify him in court. I identified him in the lineup, and I identified him in the store also. He's the same guy." Sharonda Simon, appellant's ex-girlfriend, testified that she saw appellant at the Villa Americana apartments soon after the crime. He was sitting in a vehicle that matched the description of the one used by the perpetrators of the crime, and Joubert and Glaspie were standing nearby. The State also admitted telephone records showing call locations and times that corresponded with Glaspie's testimony concerning various calls he

had made to appellant or were made by appellant in the hours immediately before and after the crime.

The testimony of accomplice-witness Glaspie, who implicated appellant and detailed his participation in the crime, is sufficiently corroborated by other independent evidence tending to connect appellant with the crime. Point of error four is overruled.

## JURY SHUFFLE

In his third point of error, appellant argues that the trial judge erred in overruling his several requests to shuffle the jury panel. While it is true that either party may request to have the entire panel of prospective jurors shuffled, a request to shuffle in a capital case must be made before the trial judge propounds questions to the venire panel concerning principles applicable to the case on trial. *See* Art. 35.11; Art. 35.17; *see also Davis v. State*, 782 S.W.2d 211, 215 (Tex. Crim. App. 1989) (holding that "[i]n a capital case, . . . the voir dire commences when the trial judge begins his examination of the panel"); *Latham v. State*, 656 S.W.2d 478, 479 (Tex. Crim. App. 1983) (holding that "[t]he accused who desires a shuffle must urge his motion to shuffle prior to the commencement of the voir dire examination"). Here, appellant's several requests to shuffle the jury were not timely.

The venire panel consisted of 395 prospective jurors. The trial judge split the venire panel into three smaller sections with 120 venire members in the first, 150 in the second, and 125 in the third. Each venire section was brought into the courtroom separately, and after excusing several prospective jurors by agreement based solely on written questionnaires, the

trial judge conducted his voir dire of each section separately. After the trial judge's voir dire of each section, prospective jurors were then excused or dismissed for cause or by agreement; the parties did not question the prospective jurors at this time. The remaining prospective jurors from all three sections were scheduled for individual voir dire to be conducted by the parties. After this individual voir dire was completed, 51 venire members that were not excused for cause or by agreement remained, and it was not until this point that appellant requested and then twice re-urged his request for a jury shuffle. The requests were denied, and the parties then exercised their peremptory strikes to empanel a petit jury of twelve and two alternates. At all times during this procedure, the prospective jurors remained in the same ordinal sequence in which they were originally empaneled.

Appellant's three requests to shuffle were all made, not only after the trial judge had begun his voir dire, but after individual voir dire questioning of the prospective jurors had concluded, and after the trial judge had already excused many prospective jurors for cause or by agreement. A jury shuffle at such a late stage would have been improper. As we have stated, "To allow either party to request a shuffle of the names of the jury panel after voir dire begins would be disruptive and unduly prolong the trial. Further, it would permit such an election to be based upon information already elicited on voir dire. Clearly, this was not the intent of the legislature." *Alexander v. State*, 523 S.W.2d 720, 721 (Tex. Crim. App. 1975).

Because appellant's requests were not timely, the trial judge did not err in refusing to shuffle the jury. Point of error three is overruled.

## PROSECUTOR'S COMMENTS AT CLOSING

In his first two points of error, appellant argues that the trial court erred when it overruled his objections concerning statements the prosecutor made at the beginning of the State's rebuttal closing argument at the guilt phase of the trial. He maintains that the prosecutor's statements were outside the record and were calculated to attack him over defense counsel's shoulders. The pertinent portion of the prosecutor's argument is as follows:

> MR. RIZZO [prosecutor]: You know, ladies and gentlemen, I have to start off by commenting on just one area the Defense counsel commented on. And I don't get into personal attacks. I've been a Prosecutor for 23 years. I just don't do it. I think it's sleazy. I don't do it.
>
> But I'm going to tell you, the personal attacks that Defense counsel made on me today, I've seen a couple of times in the last 23 years. I just want to – I'm not going to go on and comment about those other than to say that they are offensive. They're terribly offensive to me as a Prosecutor for this long a period.
>
> And I'm not going to tell you what's happened in the past in those couple of rare occasions in 23 years where someone would attack me in such a way where there's no evidence of any kind for the mere fact of trying to somehow help their client, which they should be trying to help their client, but not by personally attacking me.
>
> MR. MORROW [defense co-counsel]: Judge, I'm going to object. That's outside the record, the Prosecutor's testifying.
>
> THE COURT: Overruled.
>
> MR. RIZZO: The reason I'm allowed to talk to you about this is because it's a response to something improper.
>
> Ladies and gentlemen, if I had done just a smidgen of what [defense co-

counsel] Ms. Muldrow said, I should not only be fired, but I should be indicted. So what she did to you was she lied.

MR. MORROW: Judge, I object to Mr. Rizzo attacking [appellant] over Ms. Muldrow's shoulder.

THE COURT: Overruled.

MR. MORROW: May I have a running objection to this line of argument, Your Honor?

THE COURT: Yes.

MR. MORROW: Thank you.

MR. RIZZO: She lied. She stood up here and lied to you. And I'm going to let you know that I'm offended and that's the last I'm going to talk about that because there is no evidence from any source, none at all. And I will remember it. Ladies and gentlemen, let's go on to what we're here for.

As this Court has stated, "It is the duty of trial counsel to confine their arguments to the record; reference to facts that are neither in evidence nor inferable from the evidence is therefore improper." *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973). Thus, proper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Id.*; *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App.1999). "The arguments that go beyond these areas too often place before the jury unsworn, and most times believable, testimony of the attorney." *Alejandro*, 493 S.W.2d at 231. Consequently, error exists when facts not supported by the record are interjected in the argument, but such error is not reversible unless, in light of the record, the

argument is extreme or manifestly improper. *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988).

The State argues that the prosecutor's statements were allowable responses to the tactics used by one of appellant's attorneys, Loretta Muldrow, in cross-examining several State witnesses: "Muldrow cross-examined most of those witnesses in a manner calculated to convey the impression that they falsely testified and/or perjured themselves both at [co-defendant] Elijah Joubert's trial and/or appellant's trial, and did so at the request or direction of Dan Rizzo, an assistant district attorney assigned to prosecute both Joubert and appellant." However, proper jury argument includes answering jury argument made by opposing counsel during the argument itself, and does not include responding to prior cross-examination tactics used by opposing counsel during trial; the proper time to challenge such tactics is not during jury argument, but when the objectionable tactics are used. In short, the correct response to objectionable witness examination is to properly object at trial and correct any mis-impressions through further examination. *See generally Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000) (stating that a timely objection gives the trial court or the opposing party the opportunity to correct the error or remove the basis for the objection). Thus, we are unpersuaded that the prosecutor's statements can be characterized as an answer to the argument of opposing counsel based on opposing counsel's cross-examination of witnesses.

The State also argues that the prosecutor's statements were allowable responses to

multiple statements made by Ms. Muldrow throughout her closing argument. A review of this closing argument demonstrates that Ms. Muldrow argued that several witnesses gave false testimony, and her argument insinuated that the alleged false testimony may have been at the direction of Mr. Rizzo. This argument was premised on the facts that witnesses met with Mr. Rizzo before the capital-murder trials of appellant and his co-defendant, that witnesses gave testimony that differed from earlier statements given to police or earlier testimony given at the co-defendant's trial, that several witnesses received substantial monetary rewards from Crime Stoppers, that one witness who was charged with aggravated perjury had made a deal with Mr. Rizzo to get out of jail, and that appellant's other co-defendant reached a deal with Mr. Rizzo for a thirty-year sentence for aggravated robbery in exchange for his testimony against appellant. For example, part of Ms. Muldrow's closing argument reads as follows:

> [LaTonya Hubbard, who testified at trial and is the sister of Alisha Renee Hubbard, who also testified] met with Mr. Rizzo about three times with her and her sisters before Mr. Joubert's trial in October 2004. She saw the prop with the three photos in State's Exhibit 147. And at the trial she acknowledged giving perjured testimony. . . . She acknowledged naming [appellant] as one of the individuals there across the street of Mr. Foisner's business [the first business appellant, Glaspie, and Joubert attempted to rob]. She acknowledges that, that she gave that false testimony under oath knowing that she didn't identify anyone on April 5th of 2003. I don't know what perpetrating a lie is in your world, but in this one that's a lie.
>
> She also acknowledged Mr. Rizzo when he asked her, "Do you have an opinion who the third person is?" And she said, "I do now." That's what happens when a consensus is formed from a prop that is placed before you repeatedly. . . . "Do you have an opinion who was out there?" "Now I do." What a surprise. You think about her reasons to shade her testimony.

\* \* \*

Mr. Afzal, 68-years-old, manager at Affordable Furniture, works with Mr. Hussein who's much younger, practically snarled at me on Friday and mimicked Mr. Rizzo and said, "I said a few minutes, not seconds on the tape." And it was just moments earlier when we were back in that other room and he agreed with me in front of Mr. Rizzo that he had said a few seconds, a few minutes.

\* \* \*

[Glaspie] has no explanation for why he kept switching.  The only thing remarkable that occurred was the number of times he met with Mr. Rizzo and saw just those three photos.  And you see, it's okay for him to lie at Mr. Joubert's trial.  No harm to [appellant].  Mr. Glaspie is now a State's witness.  Remember?  He cut his deal in July of 2004.  But the problem is you dress these witnesses and rehearse them for this man's trial.  When you do that, they're no longer witnesses.  They're tools.

\* \* \*

Ericka Dockery had 120 days worth of reasons to shade her testimony for Dan Rizzo.

\* \* \*

You can't let their kind of law be the guide for you.

It is true that defense counsel is allowed wide latitude in drawing inferences from the evidence, but such inferences must be "reasonable, fair, legitimate, and offered in good faith."  *Gaddis v. State*,  753 S.W.2d 396, 398 (Tex. Crim. App. 1988).  Here, the record does not support Ms. Muldrow's insinuations that Mr. Rizzo had directed the testimony of witnesses, and given that the insinuations were unreasonable and unfair, Mr. Rizzo could properly respond to them.  However, as we have stated, "[A] prosecutor may not stray

beyond the scope of the invitation." *Johnson v. State*, 611 S.W.2d 649, 650 (Tex. Crim. App. 1981). In *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), we noted that, "Although it is impossible to articulate a precise rule regarding these kinds of argument[s], it is fair to say that a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character."

Mr. Rizzo's response was not tailored to the facts in the record or to misstatements of opposing counsel. Rather, his response delved into matters that were well outside the record, and he gave his own opinion directly impugning the veracity of opposing counsel instead of disproving her allegations with testimony from the trial or simply pointing out that Ms. Muldrow's insinuations were nothing more than her own unsupported speculation and conjecture. Accordingly, although mindful of Mr. Rizzo's predicament, we must conclude that the argument as given was improper and that the trial court erred in overruling appellant's objections to it.

But our inquiry does not end here. As we have held, improper-argument error of this type is non-constitutional in nature, and a non-constitutional error "that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692-93 (Tex. Crim. App. 2000).[2] To determine whether appellant's substantial

---

[2] We held in *Martinez*, "For arguments that strike over the shoulders of counsel, we have held that the harm standard for nonconstitutional errors-found in Texas Rule of Appellate Procedure 44.2(b)-applies. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App.1998) []. *Mosley's* holding suggests that most comments that fall outside the areas of permissible argument will be considered to be error of the

rights were affected, we balance the severity of the misconduct (*i.e.*, the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct. *Martinez*, 17 S.W.3d at 692-93. Further, in evaluating the severity of the misconduct, we must assess "whether [the] jury argument is extreme or manifestly improper [by] look[ing] at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial." *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997).[3] Viewing the State's closing as a whole, we cannot conclude that there was a willful and calculated effort to deprive appellant of a fair and impartial trial, and viewing the record as a whole, we cannot conclude that appellant was prejudiced by the remarks.

Although there were no curative measures, such as an instruction to disregard, the objectionable statements were clearly directed at opposing counsel and not at appellant. Mr. Rizzo unequivocally stated that he was directly responding to Ms. Muldrow's "personal attacks" against him. The jury heard the closing argument of Ms. Muldrow, where she

---

nonconstitutional variety. Comments upon matters outside the record, while outside the permissible areas of jury argument, do not appear to raise any unique concerns that would require us to assign constitutional status. We shall therefore apply the standard of harm for nonconstitutional errors."

[3] We stated in *Cantu*: "We noted, in *Gaddis* [753 S.W.2d 396, 398 (Tex. Crim. App. 1988)] that counsel is allowed wide latitude in drawing inferences from the evidence so long as the inferences drawn are reasonable and offered in good faith. Conversely, jury argument must be extreme or manifestly improper, or inject new and harmful facts into evidence to constitute reversible error. *Gaddis*, *supra*, at 398. In determining whether jury argument is extreme or manifestly improper, we look at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial." *Johnson v. State*, 604 S.W.2d 128, 135 (Tex. Crim. App. 1980) [(stating that "[t]his Court will not hesitate to reverse a judgment when the prosecutor engages in conduct calculated to deny the accused a fair and impartial trial")]."

repeatedly insinuated misconduct on the part of Mr. Rizzo, and then heard Mr. Rizzo's statements personally condemning Ms. Muldrow's tactics. And, as Mr. Rizzo stated after delivering his condemnation, he moved on and did not dwell on the matter. Moreover, given the corroborated accomplice-witness testimony of Glaspie implicating appellant in the capital murder, the certainty of conviction absent the misconduct remains unchanged.

We conclude that appellant's substantial rights were not affected by the prosecutor's comments. Points of error one and two are therefore overruled.

The judgment of the trial court is affirmed.

Delivered: September 24, 2008

Publish