

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00446-CR

FREDRICK TERRY                                                          APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

## FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Fredrick Terry of delivery of a controlled substance and assessed his punishment at twenty-two years' confinement and a $10,000 fine. The trial court sentenced him accordingly. In his sole issue, Appellant contends that the evidence is insufficient to support the jury's rejection of his entrapment defense. Because we hold that the evidence is sufficient to

---

[1]See Tex. R. App. P. 47.4.

support the verdict, including the jury's rejection of Appellant's entrapment defense, we affirm the trial court's judgment.

After Appellant filed his brief challenging the factual sufficiency of the evidence supporting the jury's rejection of his entrapment defense, the Texas Court of Criminal Appeals held that there is no meaningful distinction between the legal sufficiency standard and the factual sufficiency standard and that the *Jackson* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."[2] Accordingly, we review Appellant's complaint under the *Jackson* standard.

A defendant has the initial burden of producing a prima facie case of entrapment.[3] Once evidence is produced, the burden shifts to the State to disprove the defense beyond a reasonable doubt.[4] This burden of persuasion does not require the State to produce evidence to refute the entrapment claim, but requires only that it prove its case beyond a reasonable doubt.[5] Normally, as

---

[2]*Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)); *see also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[3]*Hernandez v. State*, 161 S.W.3d 491, 497 (Tex. Crim. App. 2005).

[4]*Id.* at 498.

[5]*See id.* (stating that in the burden-shifting context, entrapment behaves like self-defense); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991).

2

well as in this case, entrapment is a jury issue because its resolution depends mainly on weighing and assessing the credibility of the evidence.[6]

The jury is the sole judge of the weight and credibility of the evidence.[7] The jury is free to accept or reject all or any portion of a witness's testimony.[8] A jury's guilty verdict is an implicit finding rejecting the defense.[9]

In reviewing a jury's rejection of an entrapment defense, we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and also could have found against the defendant on the issue of entrapment beyond a reasonable doubt.[10]

Section 8.06 of the penal code provides,

(a) It is a defense to prosecution that the actor engaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

(b) In this section "law enforcement agent" includes personnel of the state and local law enforcement agencies as well as of the United

---

[6]*Hernandez*, 161 S.W.3d at 498.

[7]*Brown v. State,* 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied,* 129 S. Ct. 2075 (2009).

[8]*Hernandez*, 161 S.W.3d at 500.

[9]*Saxton,* 804 S.W.2d at 914.

[10]*Hernandez*, 161 S.W.3d at 500; *see Saxton*, 804 S.W.2d at 914; *see also Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

States and any person acting in accordance with instructions from such agents.[11]

The Texas Court of Criminal Appeals has held that this statute contains a mixed objective and subjective test.[12] It "requires an accused who claims entrapment to produce evidence that he was actually induced to commit the charged offense; that is to say, that he committed the offense because he was induced to do so."[13] After "inducement is shown, the issue becomes whether the persuasion was such as to cause an ordinarily law-abiding person of average resistance nevertheless to commit the offense."[14]

Officer Karl King of the Wichita Falls Police Department, an undercover narcotics investigator for the organized crime unit, testified that Angela Gilmore contacted him voluntarily to report that Appellant had a quantity of oxycodone to sell. King stated that Gilmore had told him that she had sold drugs for Appellant in the past. Before this contact, King had never met, spoken to, or heard of Appellant. King testified that he never directed anyone to talk to or to set up Appellant, nor, to King's knowledge, had anyone in the police department done so.

---

[11]Tex. Pen. Code Ann. § 8.06 (Vernon 2003).

[12]*England v. State*, 887 S.W.2d 902, 913 (Tex. Crim. App. 1994).

[13]*Id.* (internal quotation marks omitted).

[14]*Id.* at 914.

4

King testified that Gilmore volunteered to set up a buy bust with Appellant; he gave her no instructions about how to set up the transaction. He stated that he did not ask her to persuade or induce Appellant to sell him the pills. King testified that when Gilmore approached him, she had a pending theft charge and wanted her "time reduced." King told her that he would "talk to the DA about it." King testified that Gilmore got "[n]othing that [he knew] of" for setting up the transaction. King stated that he never promised her anything, never secured a promise from anyone at the DA's office that her time would be reduced or the charges dismissed, and never told Gilmore anything of the kind. He admitted that after the buy bust occurred, he "let the DA know what she had done for [the police]."

Regarding the buy bust, King explained that he had told Gilmore that he wanted to buy a hundred pills. She had told him that they would cost in the ballpark of $20 apiece. King testified that on the same day that he first spoke to Gilmore, he arrived in an undercover vehicle at a convenience store parking lot in Wichita Falls, the place chosen by Gilmore, at 1:00 p.m., the time chosen by Gilmore. King wore an audio wire. Gilmore and Appellant arrived in a blue Chevy truck. They got into King's vehicle, with Appellant in the front passenger seat.

Appellant told King that there had been a miscommunication and that he had only fifty pills, which he would sell to King for $1,000. Appellant told King that he could get the remaining fifty pills the next day or the day thereafter. After

Appellant let King see the pills, King gave the signal to officers monitoring the transaction. Appellant, King, and Gilmore were all handcuffed so that Appellant would not realize that Gilmore had informed on him or that King was a police officer. After Appellant's arrest, the police found 173 oxycodone tablets in a bottle in his truck. They found numerous empty oxycodone pill bottles in his home, and King testified that Appellant's wife told King that she knew that Appellant sold oxycodone to help pay the bills. Appellant's wife denied telling King that. The trial court admitted an audio recording of the buy bust without objection.

King testified that he (1) believed that Appellant freely and voluntarily entered into the transaction, (2) did nothing to induce or persuade Appellant to give him the pills, and (3) did not ask Gilmore to induce Appellant to give him the pills. King further testified that he had done nothing that would cause an ordinarily law-abiding citizen to commit a crime and that Appellant seemed ready, willing, and able, even predisposed, to commit the crime.

Officer Joseph Anderson and Lieutenant Sam Coltrain, other officers involved in the buy bust, testified. Anderson stated that he did nothing to get Gilmore to induce or persuade Appellant to sell drugs to King; Coltrain testified that he did not direct anyone to communicate with Appellant.

Appellant testified that he and Gilmore were good friends and that Gilmore told him that she would go to jail if she did not get $2,000. Appellant testified that he told her that he did not have it and that she told him that he could get it by

6

selling 100 pills at $20 apiece to someone she knew. Appellant testified that that was the only reason that he sold King his pills.

Gilmore denied Appellant's version of events; she testified that she had told Appellant, for whom she had been selling pills on a routine basis for years, that she "had a friend to hook him up with to start selling his pills to." She further testified that he had asked her to introduce him to potential buyers after she let him know that she was not going to sell pills for him anymore.

Gilmore testified that during her time of working for Appellant, he would bring the pills to her house, she would sell them, and then he would pick up his profits from her. She was paid in pills and money. These meetings between Gilmore and Appellant occurred every two or three days. She testified that he even called her the day after her release from a stint in state jail so that she could start selling his pills again.

Gilmore testified that she decided to stop selling pills for Appellant because of a rumor that the police were watching her house—she did not want to be charged with delivery again. She volunteered to inform on Appellant because she wanted to stop taking the pills and stop selling them and also because she hoped that she would get a more favorable deal on her theft charge then pending. (By the time of trial, Gilmore had four additional shoplifting cases pending.) She testified that King had told her only that he would tell the DA about her help. She did not know whether he had ever done so.

Gilmore further testified that she believed that the buy bust took place the day after she and King first spoke and that no one induced her to set up Appellant.

Based on all the evidence, the jury, as sole judge of the credibility of the witnesses, could have found beyond a reasonable doubt that Appellant committed the offense (which he did not deny) and could have also disbelieved his testimony that he committed this offense only to keep his good friend Gilmore out of jail. We therefore hold that the evidence is sufficient to support the jury's verdict, including its rejection of Appellant's entrapment defense.

We overrule Appellant's sole issue and affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 31, 2011