# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00301-CR

---

**De H Nguyen, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2020-060, THE HONORABLE GARY L. STEEL, JUDGE PRESIDING

---

### **O P I N I O N**

Appellant De H Nguyen challenges his conviction for felony murder. *See* Tex. Penal Code § 19.02. Specifically, he contends that the trial court erred when it (1) did not suppress evidence that was obtained as the result of a "geofence" warrant and (2) allowed the testimony of Nguyen's accomplice. We affirm the trial court's judgment of conviction.

### **BACKGROUND**

On May 21, 2015, at about 12:45 in the morning, a person identifying himself as "Alexander" called 911. He told the operator he was on a walk when he heard yelling, saw someone hanging out of a car window while the car drove by, heard multiple gunshots, and then saw "a body" on the sidewalk.

At trial, Officer Lucas Crawford with the New Braunfels Police Department (NBPD) testified that he was dispatched to a "shots fired call" near a commercial business on the southbound frontage road of I-35 in New Braunfels, Texas. When he arrived at the scene, he found

the deceased body of a woman, later identified as Samantha Miranda, lying on the side of the road. She was wearing only a bra, unzipped pants, and white socks. He observed a gunshot wound to her face and pooling blood. Forensic investigator Suzanne Dana testified that an autopsy of Miranda's body revealed abrasions, bruises, and that she had been shot six times.

Detective Greg Walker testified regarding surveillance video that was obtained from nearby businesses. He testified that although the footage was grainy, he watched what he believed to be the murder. He testified that the footage showed a car pull into the spot where Miranda's body was located, a car door opened twice, a person or people moved to the back of the car, somebody then slumped over, and then the car drove away.

Detective Richard Groff, the initial lead investigating detective on the case, testified that officers determined that Miranda's residence was likely connected to her murder based on the proximity—she lived "very close" to where her body was found—and her state of undress, including that she was not wearing shoes. Detective Walker testified that Miranda's apartment included indications of drug dealing and drug use. He described the apartment as appearing as though it had been "ransacked" and as showing indications that a robbery and "a violent encounter" had taken place.

Detective Groff testified that law enforcement spoke with Miranda's roommates and reviewed text messages on their cell phones, which identified a suspect, Brian Wilkerson, who was believed to have been in the apartment at or near the time of her murder. Despite conducting interviews and investigating any potential leads that came up or potential witnesses that would come forward, no significant progress was made in the case for the next four years. In 2019, Detective John Mahoney became lead detective when Detective Groff was deployed overseas with the Army Reserve.

Detective Mahoney testified that he obtained search warrants for geofence data from Google using cell-phone-mapping technology to assist in the investigation. He explained that a "geofence warrant" is a search warrant for subscriber information that Google collects and stores pursuant to an opt-in clause included in its terms of service. When law enforcement knows the area where a crime has occurred, they can obtain a search warrant for cellphone location data for devices associated with Google accounts in a specified geographical area within a specified time. He explained that it is a multistep process with the initial results provided to law enforcement anonymously—i.e. without identifying the account holders. Law enforcement then sorts through the results to determine which ones may be involved in the offense being investigated.

He explained that he came up with the initial parameters for the searches by using the information in the case file, including the 911 call, the surveillance footage, and the locations where Miranda lived and where her body was found. Detective Mahoney requested a search warrant for geofence data reflecting which cell phones were in two areas—tailored to the locations where Miranda lived and where her body was found—for a 25-minute period surrounding the 911 call. He explained that the geographical parameters around Miranda's home included her apartment complex instead of only her apartment unit because of uncertainty about how long the suspects' phones were in her apartment, where they had parked their cars, and how many times their phones would have reported their locations to Google. He stated that he "carefully crafted this geofence search warrant boundary" to not include all of the neighborhood or all the people driving on I-35 at the time. He explained that the other search area was based on where her body was found and extended to include a few businesses that were along the feeder road of I-35 in the direction that the suspect's car had traveled based on the surveillance video. He testified that none of the businesses included in the geographical-search parameters were open during the 25-minute

3

window of time of the search.  He expected the geofence search of the commercial area where Miranda was found to return results for witnesses and suspects.

The initial data returned from Google reflected that 18 anonymous devices were in the two geofence areas during the 20-minute window of time.  Detective Mahoney testified that he could not narrow down the results further based on the initial information.  Pursuant to the same warrant, he then requested location records from Google for a greater time period and geographic area related to those 18 anonymous devices to eliminate users who, based on the contextual data, did not appear to be within the scope of the warrant.  Using this data, Detective Mahoney determined that all devices except one were not relevant to Miranda's murder.  That one phone traveled up I-35 from San Antonio, was in the area of the crime scenes for approximately ten minutes, then traveled back toward San Antonio around 12:30 in the morning.  He then, pursuant to the same warrant, requested the subscriber information for the Google account associated with that one phone, which included the name, phone number, and email of the person used when creating that Google account, and the date and time the person agreed to the terms of service when they created their account.  The name returned by Google was "De Nguyen" and the account was associated with the email address "drnguyen . . . ."

Detective Mahoney obtained another search warrant authorizing Google to release additional records associated with that account for approximately a six- or seven-week period.  Those records reflected that most of the time, the phone was in Louisiana, but that two days before Miranda's murder that phone traveled to a hotel in San Antonio.  The location records showed that the day before the murder, May 20th, the phone made five round trips between a hotel in San Antonio to Miranda's apartment complex in New Braunfels and back to the hotel without making other stops.  Detective Mahoney described the route between the hotel and Miranda's apartment

4

as a "straight shot" that would take about twenty minutes one way. The phone then made a sixth trip at 12:10 a.m. the morning of the murder. It traveled to Miranda's apartment complex and was in that area for about 10 minutes, which put it at her apartment complex "a few minutes" before the gunshots were heard and her body was found. After the time of the murder, the device "immediately went back to San Antonio and the mapping show[ed] it going along I-10 all the way back to New Orleans."

Detective Mahoney used the location data in combination with records from a license-plate reader on a toll road traveled by that phone to determine that the phone was traveling in a black Infinity I30 with a Louisiana license plate registered to Nguyen that had unique lighting features on the door and headlights that were consistent with features observed in the surveillance footage from the scene of the murder. The phone number associated with the Google account was the same phone number Nguyen had provided to government agencies around May of 2015. Detective Mahoney worked with Louisiana law enforcement to identify a known associate of Nguyen's named Joseph Austin.

Detective Mahoney interviewed Nguyen in November 2019 in Louisiana. He denied having been in New Braunfels, denied the phone number associated with the suspect account was his, and claimed someone else probably took his car during that time. However, Nguyen answered affirmatively when asked if he knew Wilkerson—the person identified during the initial investigation back in 2015 as having been in Miranda's apartment close to the time of her murder.

In December 2019, Detective Mahoney interviewed Nguyen again. During this second interview, Nguyen initially continued to deny having a Google account or using his car around the time of the murder, but eventually he admitted that he was in New Braunfels and driving

5

his car and told detectives that Austin shot Miranda. During that interview he denied being "an active participant" or being involved in the planning of the robbery and told Detective Mahoney he "just dropped off [Austin] and all of a sudden, he came running out to the car and got in and said 'Go' 'Go' 'Go.' And [Nguyen] didn't know what was going on and [he] just drove."

Cell phone and mapping records for Wilkerson revealed that he and Nguyen were in communication and were traveling in similar patterns in the days leading up to Miranda's murder. The records did not show that Wilkerson and Austin were directly communicating.

Austin testified at Nguyen's trial. In 2015, he was 18 years old and living with Nguyen in Louisiana. Austin testified that it was Nguyen's plan for them to go to Texas and rob Miranda's house. He stated that Wilkerson had approached Nguyen about the robbery before Nguyen brought him into the plan. While staying in a hotel in San Antonio, Wilkerson and Nguyen traveled to New Braunfels to "case" Miranda's apartment, and when they returned, they discussed where Miranda kept her drugs, money, and weapons. The next night, Austin and Nguyen traveled to Miranda's apartment for the burglary.

Austin testified that he and Nguyen were not expecting Miranda to be home, but when they knocked on the door, she opened it. Nguyen pulled a gun and pushed his way in and wrestled with Miranda in the living room while Austin grabbed money, drugs, and multiple weapons from a bedroom he had been told would contain those items. Austin and Nguyen exited the apartment and ran for the car followed by Miranda. Austin and Nguyen got in the car and Miranda climbed on the back of the car and sat on the trunk with her back leaned against the car's rear window as it drove away. As Nguyen pulled the car onto the feeder road, Austin told him that Miranda was on the car. Nguyen pulled over and handed Austin a gun and told him to "get her off the car." Austin told Miranda to get off the car and when she did not, he fired a total of six shots

6

at her. Austin and Nguyen went "straight back to Louisiana." On the way, they stopped at a truck stop to meet Wilkerson and split the profits of the burglary.

After hearing all the evidence, the jury found Nguyen not guilty of capital murder, found him guilty of the lesser included offense of felony murder, and assessed punishment at 80 years' imprisonment. Nguyen filed a motion for new trial, which was overruled by operation of law. Nguyen appealed.

## MOTION TO SUPPRESS

In his first issue, Nguyen contends that the trial court abused its discretion when it denied his motion to suppress electronic customer data acquired through the geofence warrant because the warrant lacked sufficient probable cause, and as a result his google account data was illegally seized under the U.S. and Texas Constitutions.[1] His arguments focus on two main categories: 1) that geofence warrants are per se impermissible searches, and 2) that the search warrant in this case lacked specificity to establish probable cause.

### Standard of Review

Reviewing courts generally apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App.

---

[1] On appeal, Nguyen states that the warrant in this case also violated the protections of article I of section 9 of the Texas Constitution. However, he has not asserted that the Texas Constitution can provide greater protection than the Fourth Amendment federal counterpart on this issue. *See* U.S. Const. amend. IV; Tex. Const., art. I, § 9; Tex. R. App. P. 38.1. Further, Nguyen did not present this argument during the suppression hearing or in his suppression motion. *See State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (explaining that trial court's suppression ruling will not be reversed on ground not made to trial court). Accordingly, we analyze this issue under the Fourth Amendment only. *See Flores v. State*, 319 S.W.3d 697, 702 n.8 (Tex. Crim. App. 2010).

2019). However, when reviewing a magistrate's decision to issue a warrant, we apply a highly deferential standard of review because of the constitutional preference for searches conducted pursuant to a warrant over warrantless searches. *State v. McLain*, 337 S.W.3d 268, 271–72 (Tex. Crim. App. 2011).

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause exists when, under the totality of the circumstances, there is a 'fair probability' that contraband or evidence of a crime will be found at the specified location." *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012). "A warrant-based search is presumptively reasonable, and it is the defendant's burden to prove that a search is unreasonable." *Adkins v. State*, 418 S.W.3d 856, 860 (Tex. App.—Houston [14th. Dist.] 2013, pet. ref'd). This standard is flexible and non-demanding. *State v. Baldwin*, 664 S.W.3d 122, 130 (Tex. Crim. App. 2022). We "must give great deference to a magistrate's probable cause determination, including a magistrate's implicit finding," to encourage police officers to obtain warrants. *Id.* "When in doubt, [we] should defer to all reasonable inferences that the magistrate could have made," *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013), even "in close cases," *Duarte*, 389 S.W.3d at 354. Accordingly, "[t]he test is whether the trial court had a substantial basis for concluding the search would uncover evidence of wrongdoing." *Martinez v. State*, 660 S.W.3d 179, 192 (Tex. App.—San Antonio 2022, pet. ref'd). Our review is limited to the "four corners" of the affidavit. *See Foreman v. State*, 613 S.W.3d 160, 164 (Tex. Crim. App. 2020). However, the magistrate is permitted to draw reasonable inferences from the facts within the affidavit. *Id.* We must avoid interpreting the affidavit in a hyper-technical, rather than a common-sense, manner. *See Bonds*, 403 S.W.3d at 873.

8

*Geofence Warrants*

"Geofence warrants are a relatively new addition to the array of investigative tools available to law enforcement," *Wells v. State*, 675 S.W.3d 814, 824 (Tex. App.—Dallas 2023), *aff'd*, --- S.W.3d ---, 2025 WL 980996 (Tex. Crim. App. Apr. 2, 2025) (plurality op.), and have been increasingly utilized by law enforcement when the location of a crime is known but the identity of suspects is not, *United States v. Rhine*, 652 F. Supp. 3d 38, 66-67 (D.D.C. 2023). "[A] geofence warrant seeks cell phone location data stored by third-party companies like Google, which offers the Android operating system on which millions of smart phones run and offers other applications commonly used on phones running on other operating systems." *Id.* Thus, "[a] geofence warrant allows police investigators to search location history data for compatible mobile devices located within a specified area during a specified period of time." *Wells*, 675 S.W.3d at 821. These searches can be done without identifying the specific user, *id.* at 822, and can also be used to access subscriber information for the account holder, "which can include the subscriber's full name, address, telephone number, and other identifiers," *Matter of Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345, 351 (N.D. Ill. 2020).

One of our sister courts analyzed the limited persuasive authority available addressing the emerging issue of the legality of geofence warrants. *See Wells*, 675 S.W.3d at 826−27. As that court concluded, the geofence warrant cases can generally be divided into two categories; (1) "constitutionally infirm" geofence search warrants that did not sufficiently limit the time and place of the search "so as to restrict the executing officer's discretion and minimize the danger of searching uninvolved persons," and (2) geofence warrants that "satisfied the Fourth Amendment because [they] established probable cause to search every person found within the

geofence area." *Id.* Applying this persuasive framework, our sister court determined that the warrant at issue in that case satisfied the requirements of the Fourth Amendment. *Id.* at 827. The Texas Court of Criminal Appeals affirmed that decision.[2] *Wells*, 2025 WL 980996, at *1.

The warrant in *Wells* authorized a three step geofence search. *Id.* at *2-3. The first step directed Google to provide an anonymous list of accounts that were within the "Initial Search Parameters:" a 25-minute window of time that corresponded to the time of the offense and a polygon-shaped geographical area defined by latitude and longitude coordinates that included part of a church parking lot—where, according to surveillance video, four suspects wearing masks waited for the victim to arrive home—and the home across the street where the victim was robbed and killed. *Id.* at *2-3. The second step directed Google to "provide additional location history outside of the predefined area for those relevant accounts to determine path of travel," not to exceed 60 minutes before or after the initial 25-minute window. *Id.* at *2. The third step directed Google to provide the "subscriber's name, email address, services subscribed to, last 6 months of IP history, SMS account number, and registration IP" "[f]or those accounts identified as relevant to the ongoing investigation." *Id.*

## Discussion

Here, the warrant authorized a multi-step process similar to the warrant in *Wells*. *See id.* at *2-3. First, it directed Google to provide law enforcement with a list of anonymous

---

[2] We note that the Court of Criminal Appeals' published opinion was only joined by four judges, with two judges joining the concurrence, three judges joining the concurrence/dissent, and one judge dissenting. Although there was no majority opinion in *Wells*, a majority of the judges agreed that the first two steps of the search in that case pass constitutional muster, either because of expressed probable cause or the absence of a reasonable expectation of privacy. *See Wells*, 2025 WL 980996, at *9-10 (plurality), *13 (Finley, J. concurring), and *16 (Newell, J., concurring in part and dissenting in part).

location data for users that were within two geographical polygons—each defined by four latitude and longitude coordinates within Comal County—during a specified 25-minute period, for the stated purpose of identifying individuals who witnessed or participated in the offense of murder. Detective Mahoney's warrant affidavit explained that these two polygons were the areas where Miranda lived and where her body was found and that the 25-minute window of time was "the time frame in which the murder is believed to have occurred." The warrant then directed Google to provide, upon request, anonymous location data for those accounts from the first list that law enforcement identified as relevant to the investigation, but this time using longer temporal parameters (one hour before and after the initial temporal parameters) and exceeding the geographical parameters, with the stated purpose of ruling out irrelevant accounts through "path of travel" and "contextual location points." The warrant then directed Google to provide specific account information for accounts that had been identified as relevant through the first and second steps.

In his warrant affidavit Detective Mahoney explained his experience investigating violent crimes and his experience and knowledge of how Google collects and maintains location data for those users that opt in and other account information, including "that Google collects data from all cell phones that use Google products, and this often includes location information" and that "[t]his data is never deleted by Google." He also noted the prevalence of Google accounts being accessed on cell phones. In a section titled, "Probable Cause," the affidavit included the following factual assertions:

> On 5/21/15, New Braunfels Police Officers were dispatched to the 1000 block of
> IH 35 South (New Braunfels, Comal County, TX) for a report of Shots Fired. A
> man called 911 and told dispatchers that he saw someone screaming and hanging

11

out the window of a vehicle, then heard gunshots, then found a person lying on the sidewalk. When NBPD Officers arrived in the area they found an unconscious woman with gunshot wounds lying on the sidewalk in front of Lone Star Pools, not breathing. Paramedics responded to the scene and were unable to revive her. She was eventually identified as 23 yr old Samantha Miranda, who lived in an apartment nearby. Due to the fact that Samantha's apartment was 0.35 miles away and Samantha was not wearing a shirt when her body was found, I suspect that she may have been abducted from her apartment.

NBPD Officers obtained video surveillance footage from Lone Star Pools. I have seen this video footage and it shows a dark colored vehicle drive up to the front of the business and come to a stop. It appears that one or more of the vehicle doors come open, someone falls down on the ground, and then the vehicle speeds away. This is in the area where Samantha Miranda's body was found. [Two Detectives] conducted a series of interviews of people who knew Samantha, and I watched the recordings of these interviews. Most of the people interviewed admitted to being users of illegal drugs and told detectives that Samantha Miranda was also a user. Some people reported that Samantha Miranda was a dealer of illegal drugs. Many of these people who were interviewed by detectives had their phones searched by detectives either with consent or with search warrants. Detectives observed that these individuals had been in communication with Samantha Miranda by either calling or texting using their cell phones. Detectives searched the cell phone belonging to a man named Pedro Cantu and found a text message saying that he was coming to New Braunfels to visit Samantha, and this message was sent about an hour before her body was found.

Detective Mahoney explained that he knew from his "experience and training that most people carry cell phones on their person when they go out in public and that people who buy and sell narcotics regularly use cell phones to set up their transactions." Detective Mahoney opined in his affidavit that it was "probable that the person/s who murdered Samantha Miranda were carrying cell phones on or about their person at the time of the murder," and that it was "probable that Google [was] in possession of data from these phone/s and that this data [would] help to identify the offender/s, as well as the historical location data."

Nguyen characterizes this type of multi-step geofence warrant as an unconstitutional "general warrant" and "fishing expedition." He contends that the broad discretion

given to law enforcement to conduct the narrowing searches without additional judicial oversight between steps invalidates geofence warrants. Recently, the Texas Court of Criminal Appeals addressed the legality of geofence warrants as an issue of first impression. *Wells*, 2025 WL 980996 at *1 n. 2. Although a plurality opinion, the Court gave guidance on analyzing the legality of a multi-step geofence warrant and did not determine that they are per se illegal under either the Federal or State Constitutions. *Id.* Because the Court of Criminal Appeals declined to reach such a conclusion and Nguyen has not provided us with any binding authority to the contrary, we will also decline to do so.

Regarding the specific warrant in this case, Nguyen contends that the warrant lacked probable cause because it lacked the requisite particularity. Specifically, he contends that it did not specify the person to be searched or seized at all and that, as a result, it lacked the requisite facts to support probable cause. We disagree.

In *Wells*, the Court of Criminal Appeals addressed the defendant's argument that there was no probable cause to believe that the suspects had a cellphone with them. *See id.* at *7-8. The Court agreed with the State's argument that it is so well known that cellphone use is ubiquitous that it was reasonable for the trial court to determine that there was a fair probability that the suspects had a cellphone with them. *See id.* at *8 ("Moreover, a magistrate is entitled to take it as well-established fact that, in this day and age, almost everyone possesses a cell phone on or about his person at practically any time of day or night—they are, indeed, ubiquitous."). Additionally, in this case, the warrant affidavit also explained that based on the investigation the detectives believed that Miranda was a drug dealer, that the investigation had revealed that she had been texted by a person who stated he was on his way to visit her an hour before her murder, and that Detective Mahoney's professional experience was that drug deals often involve the use of

13

cellphones. Thus, the judge had a substantial basis to conclude that there was a fair probability that the person who killed Miranda had a cellphone with them at the time of the offense. *See id.* at *4 (agreeing with appellate court's observation that "[a]lthough it is possible the suspects were not carrying cell phones with enabled Google location services during the offense, probable cause is about 'fair probabilities,' not near certainties"), *8 (holding that geofence warrant affidavit established "probable cause to believe that Google's location history database would contain evidence relevant to identity of person who killed [victim]").

Further, in *Wells*, the Court concluded that the geofence warrant before them "provided sufficient particularity with respect to both the 'place to be searched' and the 'things to be seized.'" *Id.* at *8. Specifically, the area included the portion of a church parking lot in which surveillance footage showed the suspects waiting for the victim to arrive home, and the victim's home that was across the street from the church, for a 25-minute window of time. *Id.* at *3. The Court reasoned that the "degree of specificity appropriately circumscribed police discretion, limiting the information they could obtain from the location history database to that which was relevant to identifying whoever was present at the specific time and place of the offense itself." *Id.* at *9.

Here, the area to be searched was the commercial area in which Miranda's body was found and her apartment complex where she was robbed immediately prior to her murder, and the duration was a twenty-five-minute period surrounding when the murder was believed to have occurred based on the 911 call and surveillance video. These parameters were reasonably designed to narrow the search to find suspects that were not just driving by at the time of the suspected robbery and murder, but to narrow the focus to the person who robbed her home, transported her from her home to where her body was found, and left her on the side of the feeder

road.  Using the Court's reasoning in *Wells* as a guide, we conclude that the warrant in this case provided sufficient particularity regarding the place to be searched and the thing to be seized based on the circumstances of this case.  *Id.*

Nguyen also contends that the detective impermissibly conducted a wider search outside the initial parameters without getting an additional warrant when the detective directed production of location data for 18 phones for an hour before and after the offense.  However, the warrant authorized expansion of the location and temporal parameters to include an hour before and after the initial search window for the phones that were not ruled out as belonging to suspects during the initial search round.  Similar to the parameters chosen for the initial search, this second search was tailored to rule out those individuals who were clearly not involved in the offense.  Additionally, these are the same extended parameters that were authorized in the warrant upheld in *Wells*.  *Id.* at \*2.

Further, Nguyen contends that the parameters of the search warrant were not particular enough to protect against the search of "innocent bystanders."  In *Wells*, the Court of Criminal Appeals discussed the significance of limiting the amount of "innocent bystanders or passerby who would not have been relevant to the investigation," and focusing the parameters of the geofence search to "minimize the potential for infringing on the privacy rights of persons who could not reasonably be regarded as either suspects or witnesses to the offense."  *Id.* at \*9.  Notably, the Court focused it's reasoning on the reasonableness of the search parameters and did not prohibit the search of completely uninvolved individuals during the initial anonymous search.  *See id.*  Here, the search warrant parameters reasonably limited the search.  They included the victim's home where she had been robbed and the location where screaming and gunshots were heard by the 911 caller.  Both of those locations would reasonably contain witnesses and suspects.

15

Nguyen highlights that the search included part of the I-35 feeder road in Comal County, and he contends that inclusion of part of a major highway encompassed an impermissible number of innocent passersby. In *Wells*, the Court considered factors such as the step-one search area not being a "high-traffic" location and the offense occurring for a "brief period of time in the middle of the night." *Id.*; *id.* at *6 ("Geofence warrants that are confined, covering a relatively small space over a relatively short time, in a remote or rural area, or at a time of day when only the perpetrators of the offense or witnesses would be likely to be present, have generally been found to pass constitutional muster."). Here, the warrant's first step was confined to a 25-minute search focused to the areas of the suspected criminal activity and on the time of the offense. Based on the circumstances of this particular offense, we cannot conclude that the search warrant was not sufficiently tailored in terms of the time, place, and things to be seized. *See id.* at *8-9.

Considering the totality of the circumstances and giving the judge's determination of probable cause deference, we conclude that the geofence warrant was supported by probable cause. Thus, we conclude that the trial court did not err in denying the motion to suppress.[3] We overrule Nguyen's first issue.

## ACCOMPLICE TESTIMONY

In his second issue, Nguyen contends that there was insufficient corroborating evidence to support the accomplice-witness testimony at trial.

---

[3] Because we conclude that the warrant was supported by probable cause, we do not address the State's alternative arguments that no warrant was needed for this type of search and that if the warrant lacked probable cause, the good-faith exception would apply. *See* Tex. R. App. P. 47.1.

16

The accomplice-witness rule "requires that, before a conviction may rest upon the testimony of an accomplice witness, the accomplice's testimony must be corroborated by independent evidence tending to connect the accused with the crime." *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing Tex. Code Crim. Proc. art. 38.14). This is a statutorily imposed review that is not the same as legal and factual sufficiency review derived from constitutional principles. *Id.* Under the rule, the corroborative evidence does not have to be sufficient in itself to establish guilt and does not have to directly link the accused to the commission of the offense. *Id.* When reviewing the sufficiency of corroborating evidence under the accomplice-witness rule, "[w]e view the evidence in the light most favorable to the jury's verdict." *Id.* "All the facts and circumstances in the case, both direct and circumstantial evidence, may be looked to in furnishing the necessary corroboration." *Reed v. State*, 744 S.W.2d 112, 128 (Tex. Crim. App. 1988).

Nguyen contends that there was no corroborating evidence that connected him to the robbery or murder of Miranda and that the non-accomplice evidence showed only that he was present in the area where a crime was committed. We disagree. The non-accomplice evidence supported that Nguyen made multiple trips to Miranda's home the day before her murder, and that about 30 minutes prior to her murder, he drove a twenty-minute route from San Antonio to her apartment complex, was in that area for about ten minutes, and then at the time corresponding with her murder, immediately drove back towards San Antonio and then to his home state of Louisiana. Detective Mahoney testified that a car registered to Nguyen had distinctive features matching ones seen on the surveillance tape that captured Miranda's murder. Further, Nguyen admitted in his second police interview to being in New Braunfels that day and driving the car, and told detectives that Austin shot Miranda.

17

Viewing the evidence in the light most favorable to the verdict, the combination of Nguyen's phone's geolocation data from the day before and of the murder, the testimony about his car having matching features of the one in the surveillance video, and his admitting that he was at the crime scene is sufficient to support the admission of the accomplice-witness testimony. *See Brown*, 270 S.W.3d at 568 (concluding that defendant's "unusual conduct on the day of the offense" of asking someone to provide his alibi and defendant's admission that he "was there" when robbery and killings occurred was sufficient non-accomplice evidence to support admission of accomplice-witness testimony). We overrule Nguyen's second issue.

## CONCLUSION

Having overruled both of Nguyen's issues, we affirm the trial court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   June 27, 2025

Publish

18