

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00143-CR

EDWARD REESE                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

A Tarrant County jury found appellant Edward Reese guilty of aggravated assault with a deadly weapon. The same jury assessed his punishment at imprisonment for fifteen years. The issue on appeal is whether there was sufficient evidence presented at trial to prove that Reese was not acting in self defense. We hold that there was.

---

[1]*See* Tex. R. App. P. 47.4.

## The Evidence

Complainant Jessie Anderson testified that he was fifty-one years old, that he was disabled, and that he lived with his wife, mother, and children in an apartment in the Village Creek Town Homes public housing project in Fort Worth. On June 21, 2008, at approximately 11:15 p.m., Anderson returned home after attending his nephew's birthday party. While at that party, he had consumed four beers. When Anderson drove up to his residence, his neighbor Robert Brown invited him to join Brown and three others, all of whom were sitting on a bench and chairs in front of Brown's apartment. Anderson went inside his apartment, grabbed a beer and a half-pint of brandy, and then joined Brown and the others. Approximately fifteen minutes later, Reese came out of his apartment, which was located next to Brown's, and also joined them.

As the evening wore on, everyone eventually left, except for Anderson, Brown, and Reese. During that time, Anderson and Reese shared Anderson's brandy. Finally, Brown and Reese, who were clearly intoxicated, began arguing with each other. While Brown and Reese argued, Anderson, who was not paying attention to the argument, remained off to the side telephoning "text messages" to a friend. However, when Brown tried to throw Reese off the bench to get him to go home, Anderson told Brown not to do that because Reese was so drunk. Reese then asked Anderson what he thought about the subject of the argument. Anderson told Reese that Reese did not know all the relevant facts. Anderson

2

added that he was not involved in the subject of the argument and that he wanted to be left out of it.

At that point, Reese turned on both Anderson and Brown and repeatedly called them obscene names. He stated that he used to like Anderson but now he did not, and that he was going to his apartment to get a gun with which to kill Anderson. Reese then started walking toward his apartment, still calling Anderson an obscene name and threatening to get a gun with which to shoot him. Anderson told Reese that he did not have a gun, but Brown stated that Reese did have a gun. At that point, Anderson approached Reese, grabbed his shirt collar and shook him, and told him to quit making threats and to go home. (Anderson denied putting his hands around Reese's neck or any part of his body.)

Reese went into his apartment and moments later stepped back outside with a revolver in his hand. He pointed it at Anderson saying, "Motherf_ _ _ _ _ g n_ _ _ _r, I told you I was going to kill you." Anderson turned to run and Reese fired one shot at him. Anderson fell down on his hands and knees, got up, and ran. Reese chased him, but Anderson was eventually able to hide from Reese. Anderson did not go into his apartment, which was located in the next building, because his family was there, and he was afraid Reese might shoot through the windows. Anderson called "911" on his cell phone while running from Reese. Anderson came out of hiding when the police arrived. Blood was dripping from Anderson's finger, and a police officer told him that it appeared as if he had been

3

hit.  Anderson then directed the police to Reese's apartment.  Anderson was eventually taken to Harris Medical Hospital and was treated for a gunshot wound on his left elbow.

Gilbert Lara, a three-year veteran of the Fort Worth Police Department, testified that on June 22, 2008, at 12:18 a.m., he and police officer Donovan were dispatched to 5728 Fitzhugh Street in Fort Worth.  They arrived at the scene at 12:28 a.m. and spoke with Anderson.  Anderson appeared upset and told them what had happened to him.  They drove to Reese's apartment while Anderson remained in the patrol car.  They knocked on Reese's door and when he answered, Lara noticed that Reese smelled of alcohol.  Reese, when questioned, said he had gotten into a heated argument with Anderson and that Anderson had threatened to harm him.  Reese did not specify what Anderson had allegedly threatened to do.  Reese stated further that when Anderson let him go, he told Anderson that he was not going to let Anderson threaten him, and that he then went inside his apartment, grabbed his revolver, and fired one round at Anderson.

When Lara asked Reese where the gun was, Reese claimed that he threw it near a dumpster.  Donovan then accompanied Reese to the dumpster to retrieve the revolver.  While Donovan and Reese were away, Lara found the revolver under a couch cushion inside Reese's apartment.  When Lara asked Reese why he had lied about the gun, Reese said that he did not know.  Lara then arrested Reese and transported him to the county jail.

4

When Lara was asked by defense counsel whether the shot Reese had fired could have ricocheted off the sidewalk, he said that "anything is possible." Lara identified the revolver in court as the weapon recovered in Reese's apartment. Lara testified further that a medical service call was made for Anderson because he had an injury to his left elbow. Reese, however, had made no claim of injury. The State also presented testimony concerning the "911" call and Anderson's medical records, as well as a forensic expert's testimony concerning the revolver.

After the State rested, Reese, after being admonished outside the presence of the jury, waived his right not to incriminate himself and took the witness stand. Reese testified before the jury that he had lived in the Village Creek Apartments for about seven years prior to the incident in question, and that he was a twenty-year veteran of the United States Army. He told the jury that he was an expert rifleman. He also told the jury that he was fifty years old, he wore a prosthetic foot, and walked with a cane. Reese testified that he lived next door to Brown and that they argued all the time, but that they had never raised their hands against each other. He said that he had met Anderson around 2006. He admitted possessing a .357 Magnum revolver that he kept in his bedroom, and that it belonged to his nephew.

Reese said that on the night of the incident he was watching television and drinking beer. Sometime after dark, he walked outside and over to the bench where Brown and Anderson were sitting. He was not using his cane then

5

because he was wearing his prosthetic foot. He and Brown immediately began arguing about a neighbor "messing around" with a young girl. (As far as can be determined from the record, the argument concerned the fact that Brown had previously informed Reese that a neighbor was "messing" with a young girl. Reese had then told the neighbor, who in turn had complained to Brown.) Anderson told Reese that he was in the wrong and that made Reese angry.

Reese described to the jury how he had walked toward his apartment, and had made it as far as his front porch when Anderson grabbed him tightly around the neck, choking him, stating that he was going to beat him up, and saying that he did not care if Reese was disabled. According to Reese, when Anderson let go of him, Reese was angry, and he went inside his apartment and retrieved his gun from his bedroom. When Reese returned to his front door, Anderson was standing in the grass just off Reese's porch and Reese shot at him. Anderson jumped up and then fell to the ground before getting up and running away. Reese denied that he had chased Anderson. Reese then went inside his apartment and threw the gun under the pillow on his couch. He returned to his front porch and sat there until the police arrived.

A police officer asked him whether he had a weapon and Reese admitted that he had lied, telling them he threw it in the dumpster. He did not know why he had lied to the officers.

Reese maintained that he had not been trying to hit Anderson when he shot at him. He claimed that at the time he fired the shot, he believed that he

6

was in imminent danger. He claimed further that he fired a single shot at the ground and did not run after Anderson when Anderson ran away.

Reese admitted to the jury that he did not tell the police that Anderson had choked him. He claimed that Anderson was younger, taller, and more physically able than he was.

### The Arguments

Reese argues now that (1) there is no question that Anderson initially attacked him on his own property, and that he is smaller than Anderson and physically disabled; (2) the evidence shows that he had returned to his home and got the firearm only to defend himself; (3) when he went outside again, Anderson was still facing him in the middle of his front yard; (4) he had been afraid for his life, and had fired a single shot into the ground so as to scare Anderson away; and (5) he faced apparent danger and fired in self-defense. He further argues that near where Anderson was standing was a concrete sidewalk, and that the one shot that he fired must have ricocheted and accidentally hit Anderson.

Reese argues that the evidence adduced at trial was insufficient to support his conviction because it showed that he acted in self-defense. The State contends that there was sufficient evidence at trial to support the jury's rejection of Reese's claim of self-defense.

### Analysis

In our due process review of the sufficiency of the evidence to support a criminal conviction, we view all the evidence in the light most favorable to the

7

prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once such evidence is produced, the burden shifts to the State to disprove the defense beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). This burden of persuasion does not require the State to produce evidence to refute the self-defense claim, but requires only that it prove its case beyond a reasonable doubt. *Id*.

Self-defense is an issue of fact to be determined by the jury, which is free to accept or reject the defensive evidence. The jury, as the factfinder, is the sole judge of the weight and credibility of the evidence. *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). A jury's guilty verdict is an implicit finding rejecting the defendant's self-defense theory. *Saxton*, 804 S.W.2d at 914. Thus, in reviewing the sufficiency of the evidence to support the jury's rejection of Reese's self-defense claim, we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense and also could have found against Reese on the self-defense claim, beyond a reasonable doubt. *Id.*

8

Reese finds no fault in the trial court's charge on self-defense, which instructed the jury to acquit Reese if it found—or if it had reasonable doubt—that Reese reasonably believed that his use of force was immediately necessary to protect himself against Anderson's use or attempted use of unlawful force.

**Applicable Law**

A person commits the offense of "assault" if he intentionally, knowingly, or recklessly causes bodily injury to another, or if he intentionally or knowingly threatens another with imminent bodily injury. Tex. Penal Code Ann. § 22.01(a) (West 2011). That offense becomes "aggravated" if, among other possibilities, the person uses or exhibits a deadly weapon during commission of the assault. *Id.* § 22.02(a)(2). A firearm is a deadly weapon per se. *Id.* § 1.07(a)(17)(A).

A person may lawfully use force against another "when and to the degree the actor reasonably believes that force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). A person is not justified when using force against another in response to mere verbal provocation. *Id.* § 9.31(b)(1). One's use of force in self-defense is presumed to be reasonable if the actor had reason to believe that the person against whom the force was used was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *Id.* § 9.31(a)(1)(C).

A person may use deadly force in self-defense "when and to the degree the actor reasonably believes the deadly force is immediately necessary (A) to

9

protect the actor against the other's use of or attempted use of unlawful deadly force; or (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery or aggravated robbery." *Id.* § 9.32(a)(2) (deadly force and defense of person).

The defendant may not have provoked the person against whom the force was used. *Id.* § 9.31(a)(2); *see also Id.* § 9.31(b)(4) (stating that provocation bars subsequent self-defense claim unless the actor had previously abandoned the encounter and the other nevertheless continues or attempts to use unlawful force).

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational jury in this case could have logically found beyond a reasonable doubt that Reese did not himself reasonably believe, or was unjustified in believing, that deadly force was necessary to protect himself from the use or attempted use of any deadly force by Anderson. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. This is true for several reasons.

First, since there was no evidence that Anderson was attempting to kidnap, murder, sexually assault, rob, enter or attempt to enter Reese's apartment with force, or remove or attempt to remove Reese from his apartment with force, the jury was not required to presume that Reese's use of deadly force was reasonable. *See* Tex. Penal Code Ann. § 9.31(a)(1) (A–C).

10

Second, the evidence showed that Reese used foul language and threats toward Anderson. Admittedly, Anderson responded in a similar fashion and acted in a similar manner toward Reese. This could have been viewed by the jury as nothing more than verbal provocation and, of course, a person is not justified in using force, especially deadly force, against another in response to mere verbal provocation. *See Id.* § 9.31(b)(1).

Third, the evidence is undisputed that the initial confrontation between the parties had ended at or near Reese's front porch and that Reese had returned to his apartment before he then chose to reinitiate the confrontation by grabbing his revolver and going back to the front door and shooting toward Anderson. Under our law, once the initial encounter has ended, a defendant may not reinitiate the encounter. *See Id.* § 9.31(b)(4).

Furthermore, the actor must reasonably believe that the use of force is immediately necessary. *Id.* § 9.32(a)(2). The jury was entitled to conclude that Reese's acts of returning to his apartment after the initial verbal confrontation had ended, then getting his gun and returning outside, and then using deadly force in response to the use of non-deadly force did not support a reasonable claim of necessary self-defense on Reese's part.

The jury was also entitled to believe Reese's own testimony on cross-examination that he retrieved his gun not out of self defense, but because he was angry and wanted to scare Anderson.

11

Finally, the jury could have reasonably determined that Reese's decision to react to Anderson's choking him by getting his firearm from the apartment and shooting Anderson was unreasonable, since our law permits a person to use deadly force in self-defense only to the extent such force is immediately necessary in response to the similar use of unlawful deadly force. *Id.* § 9.32(a)(2)(A).

In making a credibility determination, the jury could have reasonably determined that Reese's decision to use deadly force was unreasonable, given that Anderson never used or threatened to use deadly force against him. The jury could have reasonably believed that Anderson grabbed Reese's shirt collar and shook him, but that Anderson never put his hands around Reese's neck. Reese, by his own admission, never told the police that Anderson had choked him. Even if Anderson had placed his hands around Reese's neck, as Reese first mentioned during his trial testimony, that conduct did not authorize use of deadly force by Reese under the facts presented here.

Given all these considerations, we hold that sufficient evidence supported the jury's rejection of Reese's self-defense claim. We affirm the trial court's judgment.

PER CURIAM

PANEL: CHARLES R. HOLCOMB (Senior Judge, Retired, Sitting By Assignment); DAUPHINOT and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 14, 2011