02-10-301-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00301-CR 

 

 


 
 
 JAMES LEMONS JR.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE 
 
 


 

 

----------

 

FROM THE 372ND DISTRICT Court OF Tarrant
COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          In
two points, Appellant James Lemons, Jr. appeals his conviction for burglary of
a habitation.  We affirm.

II. 
Factual and Procedural Background

Ronnietta
Wimbrey returned to the house where she lived with her step-mother, Joyce
Harris, to discover a man’s legs emerging from the living room window.  Wimbrey
called 911, and Lemons, who roughly matched the description Wimbrey provided to
responding Fort Worth Police Officer Thomas Hauck, was arrested ten minutes
later in a nearby parking lot and later indicted for burglary of a habitation. 
Lemons pleaded not guilty to the charge, but the trial court found him guilty.[2] 
After Lemons pleaded “true” to the two allegations in the habitual offender
notice, the trial court sentenced him to the statutory minimum of twenty-five
years’ confinement.  This appeal followed.

III. 
Sufficiency of the Evidence

Lemons
complains in his second point that the evidence is insufficient to support his
conviction. 

A.  Standard of Review

In our
due-process review of the sufficiency of the evidence to support a conviction,
we view all of the evidence in the light most favorable to the prosecution to
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).

This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at
319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact
is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075
(2009).  Thus, when performing an evidentiary sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the factfinder.  Williams v. State, 235 S.W.3d 742,
750 (Tex. Crim. App. 2007).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.  Hooper v. State, 214 S.W.3d 9, 16–17 (Tex. Crim. App.
2007).  We must presume that the factfinder resolved any conflicting inferences
in favor of the prosecution and defer to that resolution.  Jackson, 443
U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

The
standard of review is the same for direct and circumstantial evidence cases;
circumstantial evidence is as probative as direct evidence in establishing the
guilt of an actor.  Clayton, 235 S.W.3d at 778; Hooper, 214
S.W.3d at 13.

B. 
Evidence at Trial

1. 
Ronnietta Wimbrey’s Testimony

          Wimbrey,
age twenty-two, testified that around 9:00 p.m. on December 25, 2009, she pulled
into the driveway of the home she shared with her step-mother, Joyce Harris, and
saw a pair of legs emerge from a window.  She turned off her car and called
911.  As she waited for the 911 dispatcher to answer her call, a man climbed
out of the window, walked past the passenger side of her car, and ran away.  She
confirmed that both the house’s front porch light and a streetlight across the
street were lit.  She said that she and the man stared at each other as the man
walked past her car.  She also testified that the police arrived approximately
two minutes after she contacted 911, that she let the officers in the house,
and that she described the individual she saw exiting through the window to the
officers.  She confirmed that Harris, who arrived a short time later, provided
the officers with a list of items believed to be missing from the home.  

Wimbrey
identified Lemons at trial.  She also said that she saw Lemons in the hallway
outside of the courtroom and had pointed him out but that the prosecutor had
not asked her to identify anyone in the hallway.  Wimbrey based her
identification on what she saw on December 25, 2009.  She said that within ten
minutes after the officers arrived at her home, an officer took her to some
nearby apartments and asked her to identify some items displayed on the trunk
of a patrol car.  The police then asked her to look at an individual, and that
even though he was no longer wearing the hoodie, she recognized the man’s pants,
shoes, and facial features.  Wimbrey knew instantly that this was the man she
had seen crawling out of her window.  

          During
cross-examination, Wimbrey admitted that because the man wore a jacket zipped
to the top with the hood pulled over his head, she did not see the sides of his
face, his hair, or if he was wearing anything on his head; did not notice if he
had a bad complexion; and did not know what type of shirt he had on under the jacket.
 But she reiterated that she did see his nose, mouth, facial hair, outer
clothing, and shoes.  She also said that the man carried a white plastic bag
that looked “pretty full” and that appeared to contain more items than were later
recovered from Lemons’s pockets.  

2.  Officer
Thomas Hauck’s Testimony

          Officer
Hauck testified that he was dispatched at 9:00 p.m. for a burglary in progress,
that he arrived at Wimbrey and Harris’s house at 9:10 p.m., and that he issued
a radio broadcast of Wimbrey’s description of the burglar—a slender black male,
roughly six feet tall, with a mustache and goatee, and wearing a black hoodie
jacket, tennis shoes, and blue jeans.  Officer Hauck stated that he searched
the house, that the house was in disarray, and that Wimbrey provided him with a
list of items she believed to be missing.  Officer Hauck said that a few
minutes later, he learned that Officer James Alexander saw a suspicious person
darting through a nearby apartment complex’s parking lot.  

Officer
Hauck went to the apartment complex.  He and Officer Alexander found Lemons
crouching next to a car.  Officer Hauck testified that the officers detained Lemons
because he matched the description that Wimbrey had provided.  He stated that
the officers told Lemons that he was being detained, performed a frisk search,
and noted that Lemons had bulging pockets.  Officer Hauck said that after Lemons
consented to a search, the officers searched his pockets, which contained a
wallet, four packs of cigarettes, two watches, five rings, a set of earrings, a
gold bracelet, a cigarette lighter, and a wrench.  The officers believed that
some of those items belonged to Wimbrey and Harris.  Officer Hauck identified Lemons
as the person whom he had detained and in whose pockets the items were found on
the night of the burglary.  

During
cross-examination, Officer Hauck confirmed that on the night of the burglary, Lemons
claimed that he purchased the items from a black man driving a white Taurus and
planned to resell them at a profit to purchase crack cocaine.  He also said that
Lemons was not wearing a hoodie when he was detained and that the officers searched
for but did not find any discarded clothing.  Officer Hauck stated that he
arrived at the apartment complex within ten minutes after he first arrived at
Wimbrey and Harris’s home and that the complex’s parking lot was fenced in and
had one driveway that served as both an entrance and an exit.  Officer Hauck also
said that the fence had gaps through which an individual on foot could enter
the parking lot.  

3.  Officer
James Alexander’s Testimony

Officer
Alexander testified that within three minutes of receiving the initial burglary
in progress 911 dispatch, he arrived at an apartment complex two blocks from
Wimbrey and Harris’s house.  He confirmed that a fence enclosed the complex and
that a single road accessed the complex’s parking lot.  Within four or five
minutes of entering the parking lot, he saw a person sprint across the parking
lot, and he drove to the area that the person ran toward, exited his car, and found
Lemons kneeling down by a parked car.  Officer Hauck then arrived, and both
officers converged on Lemons as he crouched by the car.  

Officer
Alexander reiterated Officer Hauck’s testimony about frisking Lemons, obtaining
consent to search Lemons’s pockets, and finding Wimbrey’s and Harris’s property
in Lemons’s pockets, but he stated that they arrested Lemons based on an
outstanding warrant.  The officers searched the area for forty-five minutes but
did not find the black hoodie Wimbrey described or a laptop that Wimbrey listed
as missing.  

Officer
Alexander identified Lemons as the person that he saw running across the parking
lot and crouching by the car.  During cross-examination, Officer Alexander
confirmed that Lemons told the officers that he had bought the items from a
black man in a white Taurus but that the officers did not look beyond the
parking lot for a white Taurus.  

4.  Officer
John Romer’s Testimony

          Officer
Romer testified that he arrived at Wimbrey and Harris’s house shortly after
Officer Hauck and assisted in the search of the house.  He also said that Wimbrey
and Harris identified the items taken from Lemons’s pockets as their own.  During
cross-examination, Romer admitted that no fingerprints were found at Wimbrey
and Harris’s home.  

5.  Joyce
Harris’s Testimony

          Joyce
Harris testified that on December 25, 2009, she arrived home about ten minutes after
receiving Wimbrey’s call informing her that their house had been burglarized.  She
said that she did not give Lemons permission either to enter the house or to
take items from it.  She then identified several of the items found in Lemons’s
pockets as her property.  

C. 
Applicable Law

A
person commits the offense of burglary if, without the effective consent of the
owner, he enters a habitation and either commits or attempts to commit theft.  Tex.
Penal Code Ann. § 30.02(a)(3) (West 2011).  Burglary can be proven solely
through circumstantial evidence.  Gilbertson v. State, 563 S.W.2d 606,
608 (Tex. Crim. App. 1978); Rollerson v. State, 196 S.W.3d 818, 820
(Tex. App.—Texarkana 2006) (Rollerson I), aff’d, 227 S.W.3d 718
(Tex. Crim. App. 2007) (Rollerson II).

Further,
in cases where there is independent evidence of a burglary, the unexplained
personal possession of recently stolen property may constitute sufficient
evidence to support a conviction.  Rollerson II, 227 S.W.3d at 725; Chavez
v. State, 843 S.W.2d 586, 587 (Tex. Crim. App. 1992); see also Sutherlin
v. State, 682 S.W.2d 546, 549 (Tex. Crim. App. 1984).  Mere possession of
stolen property does not create a presumption of guilt, rather, it can support
an inference of guilt of the offense in which the property was stolen.  Hardesty
v. State, 656 S.W.2d 73, 76 (Tex. Crim. App. 1983); see also Poncio v.
State, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006).  To warrant an inference
of guilt based solely on the possession of stolen property, it must be
established that the possession was personal, recent, and unexplained.  Grant
v. State, 566 S.W.2d 954, 956 (Tex. Crim. App. 1978).  Also, the possession
must involve a distinct and conscious assertion of a right to the property by
the defendant.  Id.  The shorter the period of time between the taking
of the property and the defendant’s possession of the property, the stronger
the inference that the defendant knew the property was stolen.  Naranjo v.
State, 217 S.W.3d 560, 571 (Tex. App.—San Antonio 2006, no pet.).  If the
defendant offers an explanation for his possession of the stolen property, the
record must demonstrate that the account is false or unreasonable.  Adams v.
State, 552 S.W.2d 812, 815 (Tex. Crim. App. 1977).  Whether a defendant’s
explanation for possession of recently stolen property is true or reasonable is
a question of fact to be resolved by the trier of fact.  Dixon v. State,
43 S.W.3d 548, 552 (Tex. App.—Texarkana 2001, no pet.).  This inference of
guilt is not conclusive on its own, however, and the sufficiency of the
evidence must still be examined according to the applicable evidentiary
standards of appellate review.  Hardesty, 656 S.W.2d at 77.

D. 
Analysis

Lemons
does not dispute that a burglary was committed; instead, he contends that the
evidence is insufficient to prove that he committed the burglary.  However, the
record reflects that each element required to warrant an inference of guilt is
present.  See Grant, 566 S.W.2d at 956.  Someone roughly matching Lemons’s
description was seen climbing from the window of Wimbrey and Harris’s home, and
within minutes of the 911 dispatch, Officer Alexander saw Lemons run across a
parking lot a few blocks from the scene of the burglary and crouch near the
front tire of a car.  Approximately ten minutes after the burglary occurred,
the police found jewelry and other items taken from Wimbrey and Harris’s home
in Lemons’s pockets.  See Rollerson II, 227 S.W.3d at 725 (holding that the
defendant’s possession of items recently stolen in a burglary was legally
sufficient to convict him of the burglary, even though there were no witnesses
to the burglary); Poncio, 185 S.W.3d at 905 (same).  

Further,
by asserting that he had obtained the items from a person driving a white
Taurus, Lemons consciously asserted a right to the stolen property.  See
Grant, 566 S.W.2d at 956.  But even though Lemons offered an alternative
explanation as to why the items were in his possession, the trial court expressly
disregarded this explanation as implausible given the short time between
Wimbrey’s 911 call and Lemons’s apprehension, stating 

I agree with [the
defense’s] general proposition, [that] it doesn’t make sense to ditch the most
expensive item [the laptop].  And under normal circumstances, I agree with
that.

 

          [I]t makes
perfect sense if you’re making eye contact and watching the person making a 911
call and you’re caught in the act crawling out of the window, to get rid of the
most obviously incriminating evidence, be it a hoodie, be it a Walmart sack
with a computer or other items, because you know the police are on the way, . .
. [M]inutes later [Lemons] is in the parking lot meeting the description, being
detained and interviewed by police officers contemporaneous with the at-scene
investigation in progress, and he’s there with his pockets stuffed full of
merchandise out of this house when it makes no common sense that you have time
to sit, someone drive up in a white Taurus, wheel and deal, and shove your
pockets full of information.

 

          . . . . 

 

          And if a
person had a white Taurus and wanted to unload stuff and had been seen crawling
out of a window, it makes no sense they’re going to stop three blocks away to
wheel and deal with somebody instead of getting the heck out of Dodge because
the cavalry is on the way, . . . .  [T]he time from the time he leaves the
scene and the time the officers see [Lemons] at the location wouldn’t allow
time for another person on foot or in a car to sit there to wheel and deal.

 

          . . . . 

 

          [I]t’s in
the record, the time of the original dispatch, the time they’re observing
[Lemons] and getting follow-up calls.  There’s no logical, human, scientific
explanation for the circumstances other than he’s the guy that came out of the
window independent of any identification, independent of any eyewitnesses
identification.  

 

See Poncio,
185 S.W.3d at 905 (stating that the unexplained possession of property that has
been recently stolen in a burglary permits an inference that the defendant is
the one who committed the burglary); Adams, 552 S.W.2d at 815 (noting
that the record must demonstrate that the defendant’s explanation of his
possession of recently stolen property is either false or unreasonable before
the evidence will support the conviction of burglary); see also Gear
v. State, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (noting that an
implausible explanation permits an inference of guilt and may also be
considered as affirmative evidence of guilt).  

The trial
court, as trier of fact, was free to believe or disbelieve Lemons’s
explanation.  See id.,  Considering the evidence in a light most
favorable to the prosecution, we conclude that a reasonable minded trier of
fact could have convicted Lemons of burglary of a habitation because Lemons’s
possession of the stolen items was personal and recent, and his explanation for
his possession of the items was expressly discredited by the trial court.[3] 
See Adams, 552 S.W.2d at 815.  We overrule Lemons’s second point.

VI. 
Conclusion

          Having
overruled Lemons’s dispositive point, we affirm the trial court’s judgment.

 

PER CURIAM

 

PANEL: 
MCCOY, WALKER, and MEIER, JJ.  

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: August 25, 2011









          [1]See Tex. R. App. P. 47.4.





[2]Because Lemons challenges
the sufficiency of the evidence to support his conviction, we set out the
evidence in detail below.





[3]In his first point,
Lemons argues that Wimbrey’s identification of him on the night of his arrest
was unconstitutionally suggestive.  But because the evidence is sufficient to
support Lemons’s conviction without Wimbrey’s identification, we do not reach
Lemons’s first point.  See Tex. R. App. P. 47.1.