

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00129-CR

_____

TODD DYKE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th Judicial District Court
Titus County, Texas
Trial Court No. CR17,375

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Around midnight on July 6, 2010, Todd Dyke injured Joseph Shane Thompson[1] by shooting him with a rifle through the windshield of Dyke's truck. Defending against the resulting charge of aggravated assault with a deadly weapon, Dyke claimed he shot Thompson in self-defense. Appealing his conviction,[2] Dyke claims two evidentiary errors and that the evidence does not support the jury's rejection of self-defense. We affirm the trial court's judgment because (1) sufficient evidence supported the jury's rejection of self-defense, (2) excluding Dyke's video statement was within the trial court's discretion, and (3) admitting the challenged photographs was harmless error.

*(1) Sufficient Evidence Supported the Jury's Rejection of Self-Defense*

Dyke claims the State failed to disprove beyond a reasonable doubt his proffered self-defense theory. When a defendant asserts a claim of self-defense, the State has the ultimate burden of persuasion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). The burden of persuasion does not require the production of evidence; it requires only that the State prove its case beyond a reasonable doubt. *Id*. at 594. When a jury finds a defendant guilty, there is an implicit finding against the defensive theory. *Id.* When reviewing the sufficiency of the evidence concerning the jury's rejection of self-defense, we look to whether any rational jury

---

[1]We will refer to the victim, Joseph Shane Thompson, as Thompson. Thompson's cousin, Kendall Thompson, referenced later in this opinion, will be called Kendall.

[2]Dyke was found guilty and was sentenced to five years' confinement and a fine of $2,000.00.

could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Self-defense is a fact issue to be determined by the jury, which is free to accept or reject the defensive issue. *Saxton*, 804 S.W.2d at 913–14. The fact-finder is the sole judge of the weight and credibility of the evidence. *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008).

Thompson and two other neighbors testified that Dyke had a habit of driving his truck up and down the county road on which the various parties lived; some of the witnesses said Dyke's truck was particularly loud. On the night of July 6, 2010, Thompson said Dyke had been driving his truck up and down the road "excessively fast" and "racking his pipes off";[3] Thompson described Dyke's driving behavior as making the road "his little personal racetrack, going around and around."

Thompson went to Dyke's home to address the matter. He pulled into Dyke's driveway where he saw Dyke sitting in his own truck, backed into the driveway such that Dyke was facing Thompson's incoming truck. Thompson said he got out of his truck and saw Dyke, still seated in his truck, pointing a rifle at him. Thompson said he raised his hands and said, "Todd," whereupon Dyke lowered the rifle. Thompson said he then took a "couple more steps and heard two shots." Dyke had shot him through the windshield of Dyke's truck. Thompson called out to Dyke to "let

[3]From the context of the witnesses' testimony, we understand that the vehicle was noisy. Thompson also described Dyke as having "thr[own] it in neutral and revved the pipes" as he drove past Thompson's house five or six times that night.

3

me get out of here"; Dyke told Thompson to leave, and Thompson was able to get in his truck and drive to his cousin's house located nearby. Thompson had lead removed from one eye and suffered multiple wounds on the inside and outside of his hands, on his forearms, and on the front and back of his shoulders. When Thompson arrived at the home of his cousin, Kendall Thompson, Kendall called law enforcement. An ambulance arrived and took Thompson to the hospital. Thompson said he did not have a weapon with him that night; he owned no weapon either at the time of trial or at the time of this incident.

Kendall claims that he saw and heard Dyke driving up and down the road at excess speeds and that he heard two shots that night. Kendall said that, in the past, he would hear Dyke "at his parents' house screaming, carrying on, spinning around in the pasture."

In defense, Dyke called Michael Shane Hinton and Hinton's son, Cody. Both said that, on the night of the shooting, they had heard two shots. From the porch of their home, about 100 yards away, they could see Dyke's property, albeit through trees. Both Hintons said they saw a truck drive into Dyke's driveway. Cody said he saw a truck "coming pretty fast" down the road and a person hopped out after pulling into Dyke's drive; Michael said the truck pulled into Dyke's driveway a "[l]ittle faster than what you normally would," "at a pretty quick pace." Michael said that he saw "an outline of a person" exit "[q]uickly" from the truck, that he saw only this outline "just a few seconds," that the person's hands went up, and that he then heard two gunshots. Michael did not see a gun, but assumed the person he saw pulling into Dyke's drive had one:

4

Well, I was -- I seen his -- he's standing there, and I seen his arms come up like this. I seen an outline of a person and arms come up like that. Well, normally, that's how you hold a rifle or a gun. And then I heard gunshots, so I just assumed he was holding something, but I don't know if he was. I just assumed that. That's what I told the officers.

Michael specifically testified that he "didn't see a rifle." Cody said he could not tell if the person had a gun, due to the darkness and trees between the Hintons' porch and Dyke's drive; Cody acknowledged, though, that, in his statement to law enforcement the day after the shooting, he had said it appeared the person had a gun.

The jury heard the Hintons say that they initially assumed the person they saw getting out of the truck had a gun, but they were not sure. Thompson testified he did not have a weapon that night.[4] All the witnesses, including Thompson, heard two shots, but only one bullet hole was found through Dyke's windshield. Investigator Sergeant Baxter, however, said it was possible Dyke's shot through the windshield could have sounded like two shots. The jury's verdict of guilt was an implicit rejection of Dyke's claim of self-defense. *Zuliani*, 97 S.W.3d at 594. Viewing all the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt the elements of aggravated assault, and also could have found, beyond a reasonable doubt, against the claim of self-defense. *See Saxton*, 804 S.W.2d at 914. We overrule this point of error.

---

[4]Dyke also points to the failure of the State's investigators to pursue whether Thompson had gunshot residue on him, which might have suggested having fired a weapon. Investigator Aaron Baxter testified he was told by the crime laboratory that the laboratory did not test shooting victims, as they would necessarily show traces of gunshot residue. For this reason, said Baxter, the crime laboratory refused the submitted sample from Thompson.

*(2)    Excluding Dyke's Video Statement Was Within the Trial Court's Discretion*

Dyke also complains that the trial court erred by not allowing Dyke to present a video recording of a statement made by Dyke shortly after the shooting. When law enforcement arrived on Dyke's property after being alerted to the shooting, Dyke was handcuffed by one of the officers securing the scene. The recording in question is of Dyke and the deputy recorded by the video camera located in the deputy's car. The recording reveals that, after being handcuffed, Dyke protested that he had not done anything and that "me and Tim got into it a while back." Later on the recording, Dyke noted that Tim's last name was Thompson and that "Shane" (i.e., Joseph Shane Thompson) came on Dyke's property with a gun.

Dyke urged admission of the video, arguing his statements to the deputy were excited utterances made spontaneously after the shooting. *See* TEX. R. EVID. 803(2). Dyke also claimed the statements on the video should be admissible as *res gestae* of the events around the shooting. The trial court denied admission of the video.

We review for an abuse of discretion a trial court's determination of whether evidence is admissible under the excited utterance exception to the hearsay rule. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006) ("The admissibility of an out-of-court statement under the exceptions to the general hearsay exclusion rule is within the trial court's discretion"; trial court did not abuse its discretion in finding that declarant was "'still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement"). A trial court

6

does not abuse its discretion, and we will not reverse a trial court's ruling, unless the ruling falls outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

When the recording was offered by Dyke, the discussion and arguments among the parties and the trial court all dealt with whether the statement amounted to an excited utterance and thus met that hearsay exception; Dyke also argued the statement was admissible as *res gestae* of events that happened incident to the shooting. The trial court, in questioning the parties, questioned whether the video statement could be admitted where it would allow a statement from the defendant to be admitted to evidence without the defendant himself taking the stand. When Dyke offered the statement and claimed it was admissible as either an excited utterance or as *res gestae* of the events surrounding Thompson's shooting, the trial court gave no reason for not allowing the video to be played for the jury.

Factors we may consider in evaluating whether a statement qualifies as an excited utterance include the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving. *Apolinar v. State*, 155 S.W.3d 184, 187 (Tex. Crim. App. 2005).

The first thing heard in the video is a deputy ordering Dyke to raise and show his hands and slowly approach the officer. In a minute or so, both the deputy and Dyke come into the camera's view. The deputy handcuffs Dyke as soon as he is close enough, and almost instantly Dyke

7

begins telling the deputy his version of events: he had not done anything but try to protect himself; Dyke had "got into it a while back" with a man named Tim, and Thompson "came up here with a gun." Dyke tells the deputy he just wants to be left alone, did not mean to kill Thompson, and is sure he only nicked him; he declares he does not "mess" with anyone's wife or "nothing." Dyke also says something about a girl coming up to see him and someone running them off, so he will not have a woman again. Dyke could be upset; he arguably appears nervous and distraught. At one point, the deputy tells Dyke to calm down; at times, though he could also be described as appearing calm, for example, when not talking to the deputy. Dyke also appears calm, even nonchalant, telling the deputy about a pistol in his truck and where to find it.

The record suggests about less than half an hour elapsed between the shooting and Dyke's statements to law enforcement. Kendall called 9-1-1 at 12:06 a.m. making a noise complaint; at 12:12 a.m., Shane called to report hearing shots. Then at 12:15 a.m. Kendall called again, this time to report Thompson having been shot. There is no clock visible in the screen of the video from the deputy's car; the deputy arriving at the scene is acting with a great deal of urgency, but this could be attributed at least in part to the fact he is responding to a report of a shooting.

As for Dyke's demeanor, this is difficult to categorize. He spoke rapidly, many of his words were unintelligible, and he seemed intent on explaining his version of events as soon as the officer arrived. It is difficult to ascertain, from just watching the recording, whether what one can see and hear on the video is just his normal pattern of speaking or whether he was angry or excited.

8

Evidence of an excited emotional state, standing alone, is not enough to qualify a statement as an excited utterance. *See Martinez v. State*, 178 S.W.3d 806, 814–15 (Tex. Crim. App. 2005).

Dyke volunteered much of his commentary before any questions were posed by the deputy. It should be noted that the deputies were treating the situation as possibly dangerous: from the beginning of the video until contact with Dyke is made, the officers are commanding Dyke to raise his hands, approach them slowly, then to walk backward toward them. As soon as they made contact with him, they placed him in handcuffs. Dyke protested that he did not do anything and was only trying to protect himself. He is asked his name, then, "[W]hat's going on this evening?" At this point Dyke launches into his explanation of Thompson coming on his property and of Dyke wanting to be left alone and not meaning to kill Thompson. As soon as the officer asked if Dyke had a weapon in the truck, Dyke calmed down quickly, looked down, and told the deputy that the gun was in his truck.

Finally, we consider whether Dyke's statements were self-serving. Arguably, they were. Dyke would have benefited if the officers thought Thompson had come to his property with a gun. The trial court could have interpreted Dyke's statements as attempting to present officers with an argument for self-defense. Considering the totality of the circumstances, the trial court was within its discretion to exclude the video recording.

9

*(3)   Admitting the Challenged Photographs Was Harmless Error*

Dyke also challenges the admission into evidence of three pictures, one of a dent in the door of Dyke's truck (State's Exhibit 8) and the other two of rifle shells on the ground outside Dyke's residence.   At trial, the State answered Dyke's objections to the relevancy of these pictures by claiming that the photograph of the truck door backed up notations made in the deputies' report and that the shell casings photographed outside the door of the residence backed up the fact that Dyke regularly fired off weapons from his home.

A trial court's evidentiary rulings are reviewed under an abuse-of-discretion standard. *Montgomery*, 810 S.W.2d at 391.   An abuse of discretion occurs when a trial court's decision is outside the zone of reasonable disagreement.   *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).   Evidence is admissible only if it is relevant, that is, if it has a tendency to make any fact of consequence at issue more or less probable.   TEX. R. EVID. 401, 402.

The picture of the dent in Dyke's truck, State's Exhibit 8, and the pictures of shell casings on and around Dyke's porch, do not make any fact of consequence more or less probable.   The State argues the pictures were admissible as contextual evidence; the "photographs were useful to help the jury understand the circumstances that would make it reasonable for Joseph Shane Thompson to go to Dyke's house the night Dyke shot him."   The State points to testimony from Joseph and Kendall and the Hintons that Dyke regularly rode up and down the road in front of the witnesses' homes at high rates of speed and also that Dyke shot off multiple rounds from a firearm.

10

It is difficult to see how a picture of a dent in a vehicle and pictures of a handful of shell casings on a porch make more or less probable that Dyke shot Thompson in self-defense. The investigating officer, Baxter, testified it was determined the dent in the door of Dyke's truck, the subject of Exhibit 8, had nothing to do with the shooting of Thompson. Likewise, there is nothing suggesting Exhibits 20 and 22, showing shell casings on the porch and ground next to the porch, have anything to do with the shooting. Baxter said Dyke's truck was parked next to the porch, but the evidence suggests that Dyke shot Thompson once,[5] from inside Dyke's truck. One shell casing was found in the passenger door panel of Dyke's truck, so there is little to no relevance the casings on and near the porch could have to the charged offense. We find that the challenged photographs, Exhibits 8, 20, and 22, were improperly admitted.

We now turn to a harm analysis. The erroneous admission of evidence is a nonconstitutional error subject to the harm analysis found in Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). Under that rule, a nonconstitutional error that does not affect "substantial rights" must be disregarded. *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005). "Substantial rights" are not affected by the erroneous admission of evidence if, based on the record as a whole, the reviewing court has a fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla*, 78 S.W.3d at 355. In making this assessment, we should consider everything in the record, including

---

[5]On the other hand, witnesses seemed to agree that they heard two shots. Since there appeared to be only one hole in the windshield and Baxter opined that a shot through the windshield could sound like two shots, the jury could have concluded that only one shot was fired.

11

any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire, and whether the State emphasized the error. *Id.* at 355–56.

We have examined the entire record and feel confident the erroneous admission of the photographs at issue did not influence the jury, or had but slight effect. Neither the dent in Dyke's truck nor the shells on his porch were discussed at voir dire. The State did not spend much time discussing the photographs at trial. In closing argument, the State made several allusions to Dyke's alleged reckless behavior. It recounted Dyke's history of "driv[ing] around crazy out there, shoot[ing] his gun crazy out there"; "Todd just being Todd . . . driving around . . . recklessly, making noise. . . . shooting his gun off"; and "driving around crazy and shooting his gun crazy." Most of the State's closing argument, however, addressed Dyke's assertion of self-defense. To the extent the State's references to Dyke's driving and shooting habits could be argued as relating to the photographs, it could just as likely refer to the testimony of Kendall, who described occasions where he would hear thirty to 100 rounds of shots fired from Dyke's property or the testimony of Kendall and Joseph, who both said that Dyke had a history of driving loudly, if not recklessly, on the road connecting the parties' properties.

Viewing the entirety of the record, we find the erroneous admission of the challenged

12

photographs did not influence the jury, or had but a slight effect on the verdict. Thus, we conclude that the errors were not harmful.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     February 13, 2012
Date Decided:      March 21, 2012

Do Not Publish